PEOPLE *v* SINCLAIR

DECISION OF THE COURT

1. POISONS—MARIHUANA—STATUTES.

Defendant's conviction of possession of marihuana is reversed and set aside and defendant discharged, see Headnotes 2–32 (MCLA 335.153).

SEPARATE OPINION

SWAINSON, J.

2. COURTS—FACTS—STATUTES.

*The judiciary has the power to determine the true state of facts upon which a law is based.*

3. EVIDENCE—JUDICIAL NOTICE—APPEAL AND ERROR.

*A trial court may take judicial notice of any records of the court where it sits; an appellate court can properly take judicial notice of any matter which the court of original jurisdiction may take notice.*

---

REFERENCES FOR POINTS IN HEADNOTES

[1]  21 Am Jur 2d, Criminal Law § 569 *et seq.*
[2]  50 Am Jur, Statutes §§ 380, 381.
[3]  29 Am Jur 2d, Evidence § 57 *et seq.*
[4]  29 Am Jur 2d, Evidence § 58.
[5–8, 15, 16]  25 Am Jur 2d, Drugs, Narcotics and Poisons §§ 2, 16, 17.
[8, 15, 16]  16 Am Jur 2d, Constitutional Law § 494 *et seq.*
[9, 19, 20, 21]  25 Am Jur 2d, Drugs, Narcotics and Poisons § 21.
[10]  21 Am Jur 2d, Criminal Law § 144.
[11, 13]  25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 43, 46, 47.
[12]  20 Am Jur 2d, Courts §§ 111–117.
[14]  29 Am Jur 2d, Evidence §§ 104, 119.
[17]  20 Am Jur 2d, Courts § 236.
[18]  29 Am Jur 2d, Evidence § 408 *et seq.*
[22, 24–27, 32]  21 Am Jur 2d, Criminal Law §§ 610–615.
[23, 28–30]  21 Am Jur 2d, Criminal Law § 572.
[31]  21 Am Jur 2d, Criminal Law § 25.

4. Courts—Records—Evidence—Findings of Fact.

*The records of all courts of the state may be examined by the Michigan Supreme Court since they are all part of the record of the "one court of justice" of the State of Michigan; hence, in addition to the record made by the court below, the Michigan Supreme Court may properly look at evidence introduced and the findings of fact made by the trial court in another case (Const 1963, art 6, § 1).*

5. Poisons—Marihuana—Drugs—Narcotic Drugs.

*Comparison of the effects of marihuana use on both the individual and society with the effects of other drug use demonstrates not only that there is no rational basis for classifying marihuana with the "hard narcotics", but, also that there is not even a rational basis for treating marihuana as a more dangerous drug than alcohol (MCLA 335.151).*

6. Poisons—Marihuana—Drugs—Hallucinogens.

*Marihuana is a mild hallucinogen, and in view of its lack of any other harmful effects, there is no rational basis for penalizing it more severely than other hallucinogens (MCLA 335.106).*

7. Poisons—Marihuana—Drugs—Narcotic Drugs.

*Marihuana has been erroneously classified with the opiates, and thus it is clear that, based on current scientific knowledge, marihuana is not a narcotic drug (MCLA 335.151).*

8. Poisons—Marihuana—Drugs—Narcotic Drugs—Constitutional Law—Equal Protection.

*Marihuana is improperly classified as a narcotic and the statute that classifies it as a narcotic drug violates the equal protection clause of the state and Federal Constitutions (US Const, Am XIV; Const 1963, art 1, § 2; MCLA 335.151).*

9. Poisons—Marihuana—Statutes—Controlled Substances Act.

*Prosecutions for sale or possession of marihuana, until April 2, 1972, the effective date of the "Controlled Substances Act of 1971", must be commenced under the statute prohibiting sale or possession of d-lysergic acid diethylamide, peyote, mescaline and its salts, diemthyltryptamine, silocyn, or psilocybin and providing as a penalty a fine of not more than $500, or imprisonment in the county jail for not more than one year, or both (MCLA 335.106; 1971 PA 196).*

10. CRIMINAL LAW—ENTRAPMENT.

*The basis of the entrapment defense is that the methods used by the police are repugnant to fair play and justice.*

11. POISONS—MARIHUANA—ENTRAPMENT.

*To allow a conviction for possession of marihuana to stand is to subvert the public policy rule behind the entrapment defense where the sole basis of defendant's conviction was two marihuana cigarettes obtained purely as a result of illegal police conduct (MCLA 335.151).*

12. CONSTITUTIONAL   LAW—COURTS—PRACTICE—PROCEDURE—MARIHUANA.

*The Michigan Constitution grants to the Michigan Supreme Court general supervisory powers over the practice and procedure in a case for illegal possession of marihuana (Const 1963, art 6, § 5; MCLA 335.151).*

13. POISONS—NARCOTICS—ENTRAPMENT—EVIDENCE.

*Evidence obtained through illegal entrapment cannot be used to prosecute a defendant for possession of marihuana where the trial court has ruled as a matter of law that defendant was entrapped into the sale of marihuana and the same misconduct that occurred in the sale of the marihuana was also involved in the possession and where defendant did not volunteer the two marihuana cigarettes to the undercover agents but only gave them to the undercover agents after repeated requests by the officers, who had deceived him over a lengthy period of time.*

SEPARATE OPINION

T. M. KAVANAGH, C. J., and WILLIAMS, J.

14. POISONS—MARIHUANA—NARCOTIC DRUGS—JUDICIAL NOTICE.

*The Michigan Supreme Court can certainly take judicial notice that the characteristics of marihuana are quite different from narcotic drugs like heroin.*

15. CONSTITUTIONAL LAW—EQUAL PROTECTION—CLASSIFICATION.

*The United States Constitution and the Michigan Constitution each guarantee every citizen of the State of Michigan the equal protection of the law and both the United States Supreme Court and the Michigan Supreme Court have held that a classification which does not rest upon a reasonable basis and which is essentially arbitrary in nature constitutes*

*violation of the Equal Protection Clause (US Const, Am XIV; Const 1963, art 1, § 2).*

16. CONSTITUTIONAL LAW—EQUAL PROTECTION—MARIHUANA—CLASSIFICATION—STATUTES.

*Statutory classification of marihuana as a "hard drug" constitutes a violation of the Equal Protection Clause of the United States Constitution as such classification is irrational in view of the present evidence which exists concerning marihuana (MCLA 335.151).*

17. APPEAL AND ERROR—DECISIONS—RETROSPECTIVE DECISIONS—LEGISLATURE.

*Michigan Supreme Court, unlike the legislature, has the authority to apply its decisions retrospectively.*

SEPARATE OPINION

T. G. KAVANAGH, J.

See Headnotes 10–13, 24–30, and 32.

18. CRIMINAL LAW—EVIDENCE.

*Defendant's conviction was improper where the evidence upon which it was based should have been suppressed for all purposes because of the way it was obtained.*

19. POISONS—MARIHUANA—CONSTITUTIONAL LAW—PRIVATE PROPERTY.

*Statute prohibiting possession of marihuana violates the Federal and state Constitutions in that it is an impermissible intrusion on the fundamental rights to liberty and the pursuit of happiness, and is an unwarranted interference with the right to possess and use private property; an individual is free to do whatever he pleases, so long as he does not interfere with the rights of his neighbor or of society, and no state or Federal government has been ceded the authority to interfere with that freedom (MCLA 335.153).*

20. POISONS — MARIHUANA — PRIVATE USE — PUBLIC INTEREST — HEALTH.

*It extends the concept that traffic in marihuana is freighted with the proper public interest entirely too far to sanction proscription of possession and private use of it; some legitimate public interest might warrant state interference with what an individual consumes; but, "Big Brother" cannot, in the name of public health, dictate to anyone what he can eat or drink or smoke in the privacy of his own home.*

21. POISONS—MARIHUANA—CONSTITUTIONAL LAW—HEALTH.

*The legislature, when it proscribed the possession and private use of marihuana as a public health measure, did so unconstitutionally (MCLA 335.153).*

SEPARATE OPINION

ADAMS and T. E. BRENNAN, J.

22. CONSTITUTIONAL LAW—CRUEL OR UNUSUAL PUNISHMENT—CRIMINAL LAW—COURTS—LEGISLATURE.

*The precursor of our constitutional ban on cruel or unusual punishment was originally aimed at the infliction of punishment by judges, and was not a limitation upon the legislative branch of government in defining crimes and declaring punishments (Const 1963, art 1, § 16).*

23. CRIMINAL LAW—SENTENCES—APPEAL AND ERROR.

*The Michigan Supreme Court does have, and will occasionally exercise authority to vacate sentences which are illegal.*

24. CONSTITUTIONAL LAW—CRUEL OR UNUSUAL PUNISHMENT—CRIMINAL LAW—LEGISLATURE—COURTS.

*The conclusion that the constitutional prohibitions against cruel and unusual punishments are directed only to legislative acts and not judicial actions, does not seem warranted since the punishments prohibited by the Constitution are those "inflicted" and not those permitted or authorized by law (US Const, Am VIII; Const 1963, art 1, § 16).*

25. CONSTITUTIONAL LAW—CRIMINAL LAW—SENTENCES—FEDERAL CLAIM—STATE ACTION.

*Sentence imposed by a state court, could be made the basis for a Federal claim, even though state legislative action is not challenged, since the Eighth Amendment has now been applicable to the states by the Fourteenth Amendment (US Const, Ams VIII, XIV).*

26. CRIMINAL LAW—SENTENCES—MINIMUM SENTENCE—EXCESSIVE SENTENCE.

*It does not follow that because the legislature has left the setting of the minimum term of imprisonment to the courts, no minimum term can ever be excessive.*

27. CONSTITUTIONAL LAW—CONSTRUCTION—CRUEL OR UNUSUAL PUNISHMENT—COURTS—INDETERMINATE SENTENCES.

*The proposition that punishments can be "cruel and unusual" in the popular sense, but not in the constitutional sense should*

*be rejected as the Constitution is a popular document which must be construed by the courts to have that meaning which the people intended it to have; it is ludicrous to suppose that the people who prohibited excessive fines and bail and cruel or unusual punishment intended thereby to vest unbridled power in judges to require bail, impose fines and inflict punishments and it is equally unrealistic to conclude that the people intended to permit the legislature to give such unbridled power to the trial courts in the name of indeterminate sentences (Const 1963, art 1, § 16).*

28. CRIMINAL LAW—SENTENCES—APPEAL AND ERROR—STATUTES.
    *Constant reiteration that an appellate court is without authority to review a sentence has no basis in law or logic as, a statute provides that Justices of the Supreme Court have sentencing power, as fully as circuit judges, and there is no reason to suppose that such authority is idly given or has no relation to the appellate function (MCLA 769.1).*

29. CRIMINAL LAW—SENTENCES—APPEAL AND ERROR.
    *The authority, indeed the duty, of the Michigan Supreme Court to vacate sentences which exceed the permissible limits of statutory provisions is clear as, such sentences are illegal, and, as such, they are null and void.*

30. CONSTITUTIONAL LAW—CRIMINAL LAW—SENTENCES—DISCRETION —STATUTES.
    *A sentence of a court which violates the Constitution is illegal and the Michigan Supreme Court is not without the power to support and observe the Constitution and to apply it to the actions of judges, even when such actions are literally within the discretion vested by statute; the legislature has no power to invest a court with discretion to violate the Constitution as it is the fundamental law and is as explicit and binding on courts as the pronouncements of the legislature.*

31. POISONS—NARCOTIC DRUGS—MARIHUANA—MALUM PROHIBITUM.
    *The possession of narcotic drugs is a crime* malum prohibitum *only and this is particularly apparent in the case of marihuana as possession of a natural growing plant can hardly be* malum in se *(MCLA 335.153).*

32. CONSTITUTIONAL LAW—CRUEL OR UNUSUAL PUNISHMENT—CRIMINAL LAW—SENTENCES—MINIMUM SENTENCES.
    *A minimum sentence violates the constitutional prohibition against the inflicting of cruel or unusual punishment, and is*

*illegal and void, where it is demonstrably and grossly excessive, in the light of the depravity of the criminal as shown in the commission of the act and in light of the usual and customary disposition of those convicted of like conduct (Const 1963, art 1, § 16).*

Appeal from Court of Appeals, Division 1, Lesinski, C. J., and Bronson and Engel, JJ., affirming Recorder's Court of Detroit, Robert J. Colombo, J. Submitted November 2, 1971. (No. 19 October Term 1971, Docket No. 53,550.) Decided March 9, 1972.

30 Mich App 473 reversed.

John A. Sinclair was convicted of possession of marihuana. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Conviction reversed and set aside and defendant discharged.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Angelo A. Pentolino,* Assistant Prosecuting Attorney, for the people.

*Philo, Maki, Ravitz, Jobes, Cockrel & Robb* and *Robert Bartels, Hugh M. Davis,* and *Shellow & Shellow,* for defendant.

*Amici Curiae:*

*Sol Plafkin,* for State Senators Coleman Young, Basil Brown, and Jack Faxon, and State Representatives Jackie Vaughn III, William Broadhead, James Bradley, Edward Suski, and Daisey Elliott.

*Wallace H. Glendening,* for American Civil Liberties Union of Michigan.

*R. Keith Stroup,* for the National Organization for the Reform of Marijuana Laws.

*Michael Schuman* and *Gary Roth,* for YPC-Center House of Ferndale.

*Bernard D. Fischman,* for the American Orthopsychiatric Association, Inc.

*Philip J. Hirschkop,* for Penal Reform Institute.

*David Hood,* for New Detroit Subcommittee on Drug Treatment.

*Ernest Winsor,* for the Committee for a Sane Drug Policy.

*Thomas Meyer, M. Gerald Schwartzbach; Glotta, Audelman & Dingus; Gage, Burgess & Knox; Neal Bush; Lafferty, Reosti, Jabara, Papakhian, James & Strickgold; Mark Weiss;* and *Colista, Moore & Braun,* for the Detroit Chapter of the National Lawyers Guild.

*Goodman, Eden, Robb, Millender, Goodman & Bedrosian,* for Medical Committee for Human Rights.

PER CURIAM. For the reasons set forth in our several opinions, the judgment of conviction of defendant Sinclair is reversed and set aside and the defendant discharged.

T. M. KAVANAGH, C. J., and T. G. KAVANAGH, SWAINSON and WILLIAMS, JJ., concurred.

Swainson, J.   Defendant, John A. Sinclair, was arrested on January 24, 1967, and charged with the unlawful sale[1] and unlawful possession[2] of two marijuana cigarettes.   Defendant was convicted by a jury in the Recorder's Court for the City of Detroit of unlawful possession of the two marijuana cigarettes, on July 25, 1969, and on July 28, 1969, he was sentenced to 9-1/2 to 10 years imprisonment. During the 2-1/2 years between his arrest and trial, defendant was free on bond in the amount of $1,000, and never failed to appear when required to do so.

Prior to the trial, a special three-judge panel of Recorder's Court was convened to consider the constitutionality of the Michigan statutes prohibiting sale or possession of marijuana.   On April 17, 1968, the panel upheld the statutes against the contentions that they violated the equal protection of the laws;[3] denied defendant due process of law;[4] violated rights of privacy retained by the people;[5] and that the penalty provisions imposed cruel and unusual punishment.[6]   Judge Robert J. Colombo, a member of the three-judge panel, in a concurring opinion stated that he personally believed that there was a question of whether defendant had been entrapped.[7] The trial judge (Hon. Robert J. Colombo), on June

---

[1] MCLA 335.152; MSA 18.1122.
[2] MCLA 335.153; MSA 18.1123.
[3] US Const, Am XIV; Const 1963, art 1, § 2.
[4] US Const, Am XIV; Const 1963, art 1, § 17.
[5] US Const, Am IX.
[6] US Const, Am VIII; Const 1963, art 1, § 16.
[7] "My concurrence in the decision of the court on the issues raised here are limited solely to the issues raised here, as there appears to this writer to be another important legal issue not raised in this opinion which may well apply to count one in the people's information, namely, sale and possession of narcotics, and that is the issue of unlawful and illegal entrapment, an issue which suggests itself to this writer and which suggested itself to the learned assistant prosecuting attorney who presented this case on behalf of the people at the preliminary examination of the defendant Sinclair in this matter."

23, upon motion of defense counsel, dismissed the count for unlawful sale on the ground that the sale was entrapped by the police officers.[8] Defendant was thereafter convicted of the unlawful possession of marijuana based on the two cigarettes introduced into evidence. The Court of Appeals affirmed the conviction. 30 Mich App 473. We granted leave to appeal. 385 Mich 786.

The Detroit Police Department Narcotics Bureau had instructed Patrolman Vahan Kapagian and Policewoman Jane Mumford Lovelace to assist in an investigation of illegal activities involving narcotic violations in an area surrounding Wayne State University and, in particular, an establishment known as the Artists' Workshop which was located at 4863 John Lodge, in the City of Detroit. Defendant Sinclair made his residence above the Artists' Workshop, at 4867 John Lodge.

In pursuance of this assignment, Patrolman Kapagian grew a beard and began to let his hair grow long, in late August 1966. On October 18, 1966, using the aliases of Louis Cory and Pat Green, the officers commenced their assignment. They continued working until January 24, 1967, on this particular assignment. The officers assisted in doing typing and other odd chores at the Artists' Workshop, including sweeping floors and collating literature. They sat in at communal dinners and provided the food for one of these dinners. They joined a group called LEMAR, which advocated that marijuana be legalized. They listened to poetry and helped in the preparation of certain literature. Patrolman Kapagian visited the shop and saw defendant approximately two or three times a week until the defend-

---

[8] "We've talked a lot about it. It's up to me to come to grips with the problem. I hold that count one, Sale and/or Dispensing of marijuana should be dismissed on the grounds of entrapment."

ant's arrest. As part of the assignment, Patrolman
Kapagian took a job at the Candle Shop. Patrol-
man Kapagian was equipped with a porta-talk radio
transmitter which allowed him to keep in contact
with other police officers stationed outside and
nearby.

Patrolman Kapagian testified at the preliminary
examination that on two occasions prior to Decem-
ber 22, 1966, during the investigation, the police
officers asked defendant for marijuana. He denied
this at the trial, despite the fact that his testimony
to that effect at the preliminary examination was
read to him from the transcript. Policewoman
Lovelace stated that she had asked defendant on
previous occasions to obtain marijuana for them.

Officer Kapagian testified that on December 22nd,
at about 7 p.m., defendant appeared at the Workshop
and following an exchange of greetings, defendant
asked whether they had received any marijuana the
previous night. The officers responded affirmative-
ly and stated that they were looking for some more.
At approximately 8:55 that evening, Kapagian told
the defendant that they had to leave and defendant
asked them to accompany him upstairs to his resi-
dence. Once inside the residence, the officers were
seated at the kitchen table. Defendant went to a
shelf and removed a brown porcelain bowl which he
set down on the table before him. Defendant took
some cigarette paper and from the contents of the
bowl rolled a cigarette, which he gave to Kapagian.
Kapagian handed this cigarette to Lovelace, who
inserted it into a partially filled Kool pack. Defend-
ant then rolled a second cigarette, lit it, and handed
it to Kapagian. The officer said he did not want to
smoke it then because he had to drive and the
cigarette would make him dizzy. Kapagian gave
the cigarette to Lovelace after defendant Sinclair

had butted it. She placed the cigarette in the same Kool pack. At that time they said they had to leave, and departed. Sinclair was not arrested for committing a felony in the officers' presence because, as Kapagian stated, he did not want to tip his hand since numerous arrests were to be made as the result of this investigation.

At the trial, the only witnesses were the two police officers.[9] No corroborating evidence was introduced. Although officer Kapagian was equipped in a manner to enable the transmission of his conversation to other officers, no arrangements were made to tape the conversations, which allegedly occurred between defendant and the police officers. In addition, officer Kapagian testified that he did not preserve his log book for the year 1966 because he decided that it was not worth saving. He did admit that if the log book had been preserved, the presence or absence of entries relating to the transactions of December 22nd and all previous transactions during the investigation, would either confirm or disprove his testimony.

Prior to trial, the defendant made several motions to quash the information and to exclude the marijuana cigarettes from evidence. These were denied by the trial court.

Defendant raises ten issues on appeal, and the prosecutor lists five. We will deal with two of these:

1) Whether the classification of marijuana as a narcotic under MCLA 335.151 violates the equal protection of the laws under the US Const, Am XIV, and

---

[9] Defendant did not take the stand because the trial court ruled on July 22nd that if he did testify he could be cross-examined on his prior convictions.

2) Whether the two marijuana cigarettes should have been excluded from evidence on the ground that they constituted evidence obtained as the result of an illegal police entrapment?

## I.

It is not denied that the State of Michigan has the power to pass laws against the sale and use of marijuana. Rather, the issue is whether marijuana may be constitutionally classified as a narcotic drug if, in fact, it is not a narcotic. A threshold question is raised—and that is whether this Court has the power to determine the actual state of facts concerning marijuana and other drugs. It cannot be doubted that the judiciary has the power to determine the true state of facts upon which a law is based. *Brown* v *Board of Education,* 347 US 483; 74 S Ct 686; 98 L Ed 873 (1954).

A trial court may take judicial notice of any records of the court where it sits. *Knowlton* v *Port Huron,* 355 Mich 448, 452 (1959). Moreover, it is clear that "an appellate court can properly take judicial notice of any matter which the court of original jurisdiction may take notice". *Pennington* v *Gibson,* 57 US (16 How) 65, 14 L Ed 847 (1853).

Const 1963, art 6, § 1, provides:

*"The judicial power of the state is vested exclusively in one court of justice* which shall be divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction that the legislature may establish by a two-thirds vote of the members elected to and serving in each house." (Emphasis added.)

As such, the records of all courts of this State may be examined by the Supreme Court since they

are all part of the record of the "one court of justice" of the State of Michigan. Hence, in addition to the record made by the court below, we may properly look at the evidence introduced and the findings of fact made by the trial court in *People* v *Lorentzen,* 387 Mich 167 (1972).

We now turn to a comparison of the properties of marijuana and the other drugs classified as narcotics under MCLA 335.151 *et seq.;* MSA 18.1121 *et seq.*

## II.

Comparison of the effects of marijuana use on both the individual and society with the effects of other drug use demonstrates not only that there is no rational basis for classifying marijuana with the "hard narcotics", but, also, that there is not even a rational basis for treating marijuana as a more dangerous drug than alcohol. This is not to say that our scientific knowledge concerning any of the mind-altering drugs is at all complete. It is not.[10] Even our society's vast experience with the mind-altering effects of alcohol has not led to complete scientific knowledge of that drug, as the Canadian Government Commission of Inquiry pointed out:[11]

"Little is known as to the specific mechanism by which alcohol produces its psycho-pharmacological action. As with most drugs, alcohol effects, especially those resulting from low or moderate amounts, depend to a large extent on the individual and the situation in which the drinking occurs. A drink or two may produce drowsiness and lethargy in some instances, while the same quantity might

---

[10] *People* v *McCabe,* 49 Ill 2d 338; 275 NE2d 407, 409 (1971).

[11] Interim Report of the Canadian Government Commission of Inquiry, *The Non-Medical Use of Drugs* (Penguin ed 1970), pp 65–66 (hereinafter referred to as "Canadian Commission Report").

lead to increased activity and psychological stimulation in another individual, or in the same person in different circumstances.   Furthermore, a dose which is initially stimulating may later produce sedation."

Despite our lack of complete knowledge though, we do have sufficient scientific knowledge to categorize drugs according to their relative level of danger to both the individual and society.   Proceeding to a comparison of marijuana with other mind-altering drugs, we find marijuana is a euphoria producing, mind-altering drug, whose effects are generally obtained by smoking, but can also be obtained by oral ingestion of the drug, usually mixed with other food or drinks.[12]   Coming from the hemp plant, cannabis sativa, the psychoactive strength of the drug varies greatly with the part of the plant used, quality of the seed stock, and the growing conditions.[13]

The psychoactive ingredient of cannabis sativa has been isolated as two isomers of tetrahydrocannabinol (THC, although additional active ingredients of cannabis sativa may be discovered and isolated in the future).[14]   Thus the strength of any

---

[12] The Illinois Supreme Court in *People* v *McCabe, supra* p 410, point out that knowledge concerning marijuana has been developing rapidly in the last decade.   For an example of a case where the United States Supreme Court relied on the current writing of authorities in a then rapidly developing field, see *Brown* v *Board of Education,* 347 US 483, 494, fn 11; 74 S Ct 686; 98 L Ed 873 (1954).
   L. Grinspoon, M.D., *Marijuana Reconsidered* (Bantam ed 1971), p 46.

[13] L. Grinspoon, M.D., *Marijuana Reconsidered* (Bantam ed 1971), pp 39–40.

[14] Stipulated Findings of Fact (No 19) in *People* v *Lorentzen, supra,* reads: "There is no proven relationship between the use of marijuana and the use of heroin.   As marijuana use has increased greatly in American society, heroin addiction in proportion to the population has remained essentially the same, or only slightly increased."
   See, also, L. Grinspoon, M.D., *Marijuana Reconsidered* (Bantam ed 1971), pp 47–61.

given amount of marijuana depends primarily on the amount of THC it contains. The ordinary street form of marijuana, commonly available and used in the United States, is composed of the leaves and flower clusters of the· female plant, which are dried and crushed to make up the variable strength mixture. The resin from the flowering tops of the mature female plants is known as hashish (*charas* in India) and is apparently the strongest form of the naturally occurring drug because it contains the highest concentration of THC. Hashish is as much as eight times as strong as ordinary marijuana.[15]

Consideration of the scientifically observed physical and psycho-motor effects of marijuana indicates that it is overall, the least dangerous mind-altering drug. Observed physical effects of marijuana use include dryness of mouth and throat, slight increase in pulse rate, and slight conjunctival reddening of the eyeball.[16] No known tolerance develops to marijuana—in fact negative tolerance has been observed, that is, a decreased amount of the drug taken on subsequent occasions produces the same level of physical and euphoric effect.[17] No physical dependency is produced by use of the drug and, hence, there are no withdrawal symptoms or "ab-

---

[15] President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Narcotics and Drug Abuse* (1967), p 3: "Other derivatives of the hemp plant, such as hashish, which are more potent than marijuana, are rarely found in the United States."

See, also, L. Grinspoon, M.D., *Marijuana Reconsidered* (Bantam ed 1971), pp 41–43.

[16] *People v Lorentzen, supra*, Stipulated Findings of Fact (No 8): "The major physical effect of THC that can be detected is a marked increase in pulse rate."

See, also, Canadian Commission Report, p 122.

[17] *People v McCabe, supra*, p 411; *People v Lorentzen*, Stipulated Findings of Fact (No 4): "There is no currently known tolerance to marijuana but the question is still under investigation." Canadian Commission Report, p 122.

stinence syndrome" when the drug is unavailable to the user.[18]

No lethal dose for marijuana has been established.[19] The lack of harmful physical effects from marijuana use has been well summarized by Dr. Grinspoon in *Marijuana Reconsidered* (Bantam ed 1971), p 60:

"What is so striking about the pharmacology of cannabis is that it has such limited and mild effects on human nonpsychic function. This is consistent with the equally striking observation that there has never in its long history been reported an adequately documented case of lethal overdosage. Nor is there any evidence of cellular damage to any organ."

Both the opiates and alcohol provide a dramatic contrast to the lack of physical harmfulness of marijuana. With the opiates[20] high levels of tolerance develop,[21] severe physical addiction results from repeated use,[22] and deaths resulting from overdosage also occur.[23] Occasional social use of alcohol

---

[18] *People* v *Lorentzen,* Stipulated Findings of Fact (No 5): "Marijuana does not produce physical dependency."
Canadian Commission Report, p 123.

[19] *People* v *McCabe, supra,* p 411; *People* v *Lorentzen,* Stipulated Findings of Fact (No 7): "Marijuana does not produce death, even with a single large overdose, which is characteristic of depressant drugs including alcohol."

[20] "These drugs are obtained from the juice of the unripened seed pod of the opium poppy plant [papaver somniferum] soon after the flower petals begin to fall—no other part of the plant produces psychoactive substances." Canadian Commission Report, p 147. Heroin, codeine and morphine are all processed derivatives of opium. Isonipecaine and anileridine are synthetic "opiates" whose physical effects and addictive liability are equivalent to morphine. *Stedman's Medical Dictionary* (1966), p 95.

[21] Canadian Commission Report, p 43; Report by the Advisory Committee on Drug Dependence, *Cannabis,* (Her Majesty's Stationery Office, London, 1968) p 14 (hereinafter referred to as "British Report").

[22] Canadian Commission Report, pp 153–154; British Report, p 15.

[23] Canadian Commission Report, p 151; British Report, p 14; President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Narcotics and Drug Abuse,* p 54: "One of

in moderate dosage as a mind-altering drug has few deleterious physical consequences. However, tolerance does develop in alcohol use and the drug is subject to a great, acute and chronic abuse.[24] Acute alcohol abuse can lead to death from overdosage.[25] In addition, chronic alcohol abuse leads to alcoholism where a clear withdrawal syndrome is observable (an easily discernible physical shaking and later *delirium tremens*), and death of brain cells, mental deterioration, and cirrohsis of the liver may occur.[26]

Damaging effects of alcohol on psychomotor coordination are so well known as to need no documentation. The President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Drunkenness,* commenting on alcohol, observed that (p 39):

"There is probably no other area in the field of drug research and related dangerous behavior where the role of a drug as a precipitating factor in dangerous behavior is so clear."

On the other hand, the evidence available concerning marijuana's effect on psychomotor functions seems to show very little impairment, at least in experienced users.[27]

---

the special features of the opiates (and certain other mind-altering drugs such as barbiturates and some tranquilizers) is that death may also be produced by not giving the drug. That is the classical withdrawal or abstinence syndrome associated with opiate deprivation in an organism which has been receiving heavy doses of the opiate."

[24] Canadian Commission Report, pp 43, 70–72.

[25] President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Drunkenness* (1967), p 35.

[26] President's Commisison on Law Enforcement and Administration of Justice, *Task Force Report: Drunkenness,* p 35; J. Kaplan, *Marijuana: The New Prohibition* (Pocket Book ed 1971), pp 275–320, specifically p 318.

[27] *People v Lorentzen, supra,* Stipulated Findings of Fact (No 30): "It is a debatable and equivocal question as to whether or not one under the influence of marijuana and driving on the highway is a better or worse driver. The experienced marijuana smoker per-

*Psychological Effects:*

Marijuana is a mild hallucinogen, which in view of its lack of any other harmful effects, leads us to conclude that there is no rational basis for penalizing it more severely than the other hallucinogens (MCLA 335.106; MSA 18.1106). Indeed, mild hallucinogenic effects are reported almost exclusively from use of more potent hashish type preparations and rarely, if ever, from the use of ordinary street variety marijuana. The Canadian Commission Report states (pp 116–117):

"Cannabis is one of the least potent of the psychedelic drugs, and some might object to its being classified with LSD and similar substances. It is often suggested that marijuana is a mild intoxicant, more like alcohol. * * * It would be incorrect to say that cannabis in moderate dose actually produces a mild LSD experience; the effects of these two drugs are physiologically, behaviourally and subjectively quite distinct. Furthermore, since no cross-tolerance occurs between LSD and THC the mechanism of action of these two drugs is thought to be different."

The Canadian Commission Report comprehensively summarized the various possible psychological effects of marijuana use as follows (pp 117–118):

"A cannabis 'high' typically involves several phases. The initial effects are often somewhat stimulating and, in some individuals, may elicit mild tension or anxiety which usually is replaced by a pleasant feeling of well-being. The later effects usually tend to make the user introspective and

forms as well under the influence of the drug as he does when he is not using it. The inexperienced user performs less well."

See, also, R. Bonnie and C. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition,* 56 Va L Rev 971, 1107 (1970).

tranquil. Rapid mood changes often occur. A period of enormous hilarity may be followed by a contemplative silence.

"Psychological effects which are typically reported by users include: happiness, increased conviviality, a feeling of enhanced interpersonal rapport and communication, heightened sensitivity to humour, free play of the imagination, unusual cognitive and ideational associations, a sense of extra-ordinary reality, a tendency to notice aspects of the environment of which one is normally unaware, enhanced visual imagery, an altered sense of time in which minutes may seem like hours, changes in visually perceived spatial relations, enrichment of sensory experiences (subjective aspects of sound and taste perception are often particularly enhanced), increased personal understanding and religious insight, mild excitement and energy (or just the opposite), increased or decreased behavioural activity, increased or decreased verbal fluency and talkativeness, lessening of inhibitions, and at higher doses, a tendency to lose or digress from one's train of thought. Feelings of enhanced spontaneity and creativity are often described, although an actual increase in creativity is difficult to establish scientifically. While most experts agree that cannabis has little specific aphrodisiac (sex stimulating) effect, many users report increased enjoyment of sex and other intimate human contact while under the influence of the drug.

"Less pleasant experiences may occur in different individuals, or possibly in the same individuals at different times. Some of these reactions may include: fear and anxiety, depression, irritability, nausea, headache, backache, dizziness, a dulling of attention, confusion, lethargy, and a sensation of heaviness, weakness and drowsiness. Disorientation, delusions, suspiciousness and paranoia, and in some cases, panic, loss of control, and acute psychotic states have been reported."

There is no reliable scientific evidence demonstrating that chronic psychosis can be caused by marijuana use[28] in dramatic contrast to the American experience with alcohol.[29]     The argument that marijuana use causes or contributes to assaultive crime is now largely discredited.[30]     Again by contrast, considerable evidence points to a substantial connection between alcohol use and commission of violent crimes.[31]

Finally, the "stepping stone argument" that marijuana use leads to use of "hard narcotics" has no scientific basis.     The President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Narcotics and Drug Abuse,* found at pp 13–14:

"The charge that marihuana 'leads' to the use of addicting drugs needs to be critically examined. There is evidence that a majority of the heroin users who come to the attention of public authorities have, in fact, had some prior experience with marihuana. But this does not mean that one leads to the other in the sense that marihuana has an intrinsic quality that creates a heroin liability.     There are too many marihuana users who do not graduate to heroin, and too many heroin addicts with no known prior mari-

---

[28] British Report, p 16.

[29] Canadian Commission Report, p 69; President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Drunkenness* (1967), p 35.

[30] President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Narcotics and Drug Abuse* (1967), p 25; British Report, p 16; *Report of the Indian Hemp Drugs Commission* (1893–94), p 264; J. Kaplan, *Marijuana: The New Prohibition,* pp 139–141; Bonnie and Whitebread, *The Forbidden Fruit and The Tree of Knowledge,* p 1105.

[31] President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Drunkenness* (1967), p 41: "On the basis of the present data one can say that there is a strong link between alcohol and homicide and that the presumption is that alcohol plays a causal role as one of the necessary and precipitating elements for violence."

huana use, to support such a theory. *Moreover there is no scientific basis for such a theory.* The basic text on pharmacology, Goodman and Gilman, *The Pharmacological Basis of Therapeutics* (Macmillan 1960) states quite explicitly that marihuana habituation does not lead to the use of heroin." (Emphasis added.)[32]

All of the preceding factual findings with respect to the effects of marijuana use, are substantiated by the trial court's findings of fact made after five days of expert testimony in *People* v *Lorentzen, supra.*

Virtually every major commission which has studied the effects of marijuana use agrees that it is improperly classified with the "hard narcotics". The British Report found (pp 6–7):

"Having reviewed all of the material available to us we find ourselves in agreement with the conclusion reached by the Indian Hemp Drugs Commission appointed by the Government of India (1893–1894) and the New York Mayor's Committee on Marihuana (1944), that the long-term consumption of cannabis in *moderate* doses has no harmful effects."[33]

Further, counsel for the people admitted in oral argument that the differences between marijuana and the opiates call for different classifications:

"Adams, J.: If we have two extremes here, and not a gray area in the middle, doesn't that call for different classifications?

---

[32] *People* v *McCabe, supra,* pp 412, 413. See, also, British Report, pp 12–13.

[33] *People* v *McCabe, supra,* p 411. Also, the British Report concluded on the classification question (pp 20–21): "We believe that the association of cannabis in legislation with heroin and the other opiates is *entirely inappropriate* and that new and quite separate legislation to deal specially and separately with cannabis and its synthetic derivatives should be introduced as soon as possible. We are also convinced that the present penalties for possession and supply are altogether too high." (Emphasis added.)

"*Assistant Prosecutor:* I think it does, I think it does, and I think every state in the country is graduating to that particular state where they are now recognizing and they are classifying marijuana in a separate statute. The government has done so in its control and abuse act."

Finally, Governor William Milliken, in his *Special Message to the Legislature on Alcohol and Drug Abuse* (Mar 4, 1971), recognized that the present classification of marijuana with the opiates is irrational and provided an illuminating comment on the relative danger of alcohol:

"As public officials, we must face squarely the need for a major revision of our laws dealing with marijuana. The hypocrisy of our present law, *which falsely classifies marijuana as a narcotic,* affects the credibility of our entire drug abuse program. Recent federal legislation and the passage of local marijuana ordinances give new urgency to the need for state action in this controversial area. * * *

"Alcohol continues to be a larger problem than drugs. It accounts for more broken homes, wasted lives, accidental deaths, and greater expense for society than any drug. It is an established fact that alcohol can destroy brain tissues and cause cirrhosis of the liver which ultimately produces death. A significant portion of crime is committed by people under the influence of alcohol and alcohol-related problems are estimated to account for 15% to 25% of our welfare costs." (Emphasis added.)

The murky atmosphere of ignorance and misinformation which casts its pall over the state and Federal legislatures' original classification of marijuana with the hard narcotics has been well documented in the 250-page article by R. Bonnie and C. Whitebread, II, *The Forbidden Fruit and the Tree*

*of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition,* 56 Va L Rev 971 (1970).[34]

We can no longer allow the residuals of that early misinformation to continue choking off a rational evaluation of marijuana dangers. That a large and increasing number of Americans recognize the truth about marijuana's relative harmlessness can scarcely be doubted.[35]

The truth compels us to conclude at the minimum that marijuana has been erroneously classified with

---

[34] The unavailability of the Indian Hemp Drugs Commission Report and the general lack of information upon which most legislatures criminalized marijuana is pointed out by J. Kaplan's introduction to the 1969 reprint of the *Report of the Indian Hemp Drugs Commission 1893–1894,* vii-xiii (Jefferson ed 1969).

[35] *People v Lorentzen, supra,* Stipulated Findings of Fact Nos 37–42: "From the general public standpoint, the general marijuana user would require no treatment at all. Most marijuana users do not have problems that would require any treatment from a medical or psychiatric point of view. Those that seek help because they have had an adverse reaction to marijuana or because they think they are using too much of the drug ordinarily need some guidance and some support and not much else. The majority of current marijuana users are using but not abusing the drug in the sense that one would normally think of dangerous drug abuse. To say that marijuana is an absolutely harmless drug is untrue, on the other hand to say it is a horrendous drug is equally untrue. Marijuana is a drug with potential dangers for some people when taken in conventional doses. Marijuana is safe for most people in conventional doses. Occasional, recreational use of marijuana for most individuals will be a pleasurable experience, involving no adverse reactions. The vast majority of recreational marijuana users will emerge from their drug experience without any apparent harm, either to themselves or to society."

J. Kaplan, in *"Marijuana: The New Prohibition,"* p 338, stated: "Another attempt to measure the deterrent effect of the marijuana laws was a careful study by two law students, Ellen Green and Bruce Blumberg, who sampled the student body at the University of California Law School at Berkeley. They found that seventy-three percent of this student body had used marijuana, a figure that is quite striking when one considers that law students would be expected to be among the most deterrable members of our society. Being involved in the law, they are more likely to know of its consequences; studying for a profession that regards moral character as one of its prerequisites, they would be risking more than arrest or imprisonment if detected using marijuana; and, finally, at least most observers have considered lawyers and law students to be among the more conservative and cautious groups of our student population."

the opiates, and thus it is clear that based on current scientific knowledge, marijuana is not a narcotic drug.

Indeed, the Michigan legislature has recognized the erroneous classification of marijuana as a narcotic by its passage of the "Controlled Substances Act of 1971" (1971 PA 196; MCLA 335.301 to 335-.367; MSA 18.1070[1] to 18.1070[67]), effective April 1, 1972, which classifies marijuana as a distinct type of substance and provides drastically reduced penalties for its sale and possession.

We agree with the Illinois Supreme Court in *People* v *McCabe, supra,* that marijuana is improperly classified as a narcotic and hold that MCLA 335.151; MSA 18.1121, in its classification of marijuana violates the equal protection clauses of the US Const, Am XIV and Const 1963, art 1, § 2.[36]

### III.

Defendant contends that the two marijuana cigarettes should not have been admitted into evidence because they were the result of an illegal police entrapment. The prosecution asserts that the two cigarettes were admissible because the defendant

---

[36] The decision today does not mean that persons arrested for sale or possession or marijuana cannot be prosecuted under the laws of the State of Michigan. Until April 1, 1972, the effective date of 1971 PA 196, prosecutions must be commenced under MCLA 335.106; MSA 18.1106, which reads:

"Any person who violates any of the provisions of this act is guilty of a misdemeanor, and upon conviction shall be subject to a fine of not more than $500.00, or imprisonment in the county jail not more than 1 year, or both such fine and imprisonment in the discretion of the court. Any person, firm, partnership, association or corporation who sells, offers for sale, barters or otherwise disposes of or is in possession of d-lysergic acid diethylamide, peyote, mescaline and its salts, dimethyltryptamine, silocyn, or psilocybin or any salt or derivative of any of the aforementioned substances or any other drug possessing similar hallucinogenic properties is guilty of a felony unless in accordance with the federal food, drug and cosmetics act."

possessed them independently of the undercover officers' request for them.

The trial court ruled that the sale count should be dismissed because the defendant had been entrapped into committing this offense. Our Court has long recognized the defense of entrapment and the public policy behind this rule. In *Saunders* v *People,* 38 Mich 218 (1878), the Court reversed Saunders' conviction for breaking and entering by night a court room not connected with a dwelling and "taking therefrom certain recognizances described as contracts in force and public records". The Court held:

"Decoying, or conniving with persons suspected of criminal designs, for the purpose of arresting them in the commission of the offense, is denounced by the Supreme Court." (Syl 1.)

Justice Cooley, writing for the Court, reversed on the grounds that the testimony of a witness named Dunnebacke, should not have been excluded. Two of the Justices held that the conviction should be reversed because of impermissible police conduct. Justice Marston stated (pp 221–222):

"I cannot, however, silently permit the extraordinary course adopted by the police officers in this case to pass unnoticed and uncondemned. * * *

"The course pursued by the officers in this case was utterly indefensible. Where a person contemplating the commission of an offense approaches an officer of the law, and asks his assistance, it would seem to be the duty of the latter, according to the plainest principles of duty and justice, to decline to render such assistance, and to take such steps as would be likely to prevent the commission of the offense, and tend to the elevation and improvement of the would-be criminal, rather than to his farther debasement. Some courts have gone a great way in giving encouragement to detectives, in some very

questionable methods adopted by them to discover the guilt of criminals; but they have not yet gone so far, and I trust never will, as to lend aid or encouragement to officers who may, under a mistaken sense of duty, encourage and assist parties to commit crime, in order that they may arrest and have them punished for so doing. The mere fact that the person contemplating the commission of a crime is supposed to be an old offender can be no excuse, much less a justification for the course adopted and pursued in this case. If such were the fact, then the greater reason would seem to exist why he should not be actively assisted and encouraged in the commission of a new offense which could in no way tend to throw light upon his past iniquities, or aid in punishing him therefor, as the law does not contemplate or allow the conviction and punishment of parties on account of their general bad or criminal conduct, irrespective of their guilt or innocence of the particular offense charged and for which they are being tried. Human nature is frail enough at best, and requires no encouragement in wrong-doing. If we cannot assist another and prevent him from violating the laws of the land, we at least should abstain from any active efforts in the way of leading him into temptation. Desire to commit crime and opportunities for the commission thereof would seem sufficiently general and numerous, and no special efforts would seem necessary in the way of encouragement or assistance in that direction."

Chief Justice CAMPBELL stated (p 223):

"[T]he encouragement of criminals to induce them to commit crimes in order to get up a prosecution against them, is scandalous and reprehensible."

Two theories have been advanced concerning the issue of entrapment. The first view was articulated

by Chief Justice Hughes in *Sorrells* v *United States,*
287 US 435, 451; 53 S Ct 210; 77 L Ed 413 (1932),
when he stated:

"[T]he defense of entrapment is not simply that
the particular act was committed at the instance of
government officials. That is often the case where
the proper action of these officials leads to the reve-
lation of criminal enterprises. * * * The predis-
position and criminal design of the defendant are
relevant. But the issues raised and the evidence
adduced must be pertinent to the controlling ques-
tion whether the defendant is a person otherwise in-
nocent whom the Government is seeking to punish
for an alleged offense which is the product of the
creative activity of its own officials. If that is the
fact, common justice requires that the accused be
permitted to prove it. The Government in such a
case is in no position to object to evidence of the
activities of its representatives in relation to the ac-
cused, and if the defendant seeks acquittal by reason
of entrapment he cannot complain of an appropriate
and searching inquiry into his own conduct and pre-
disposition as bearing upon that issue."

In *Sherman* v *United States,* 356 US 369; 78 S Ct
819; 2 L Ed 2d 848 (1958), the majority of the Court
adopted the position of Chief Justice Hughes in
*Sorrells, supra.* Thus, according to the majority
view, whenever the defense of entrapment is raised,
the court must look at 1) the conduct of the police,
and 2) the predisposition of the defendant. The
second view was stated by Justice Roberts in *Sor-
rells* (pp 458–459):

"It has been generally held, where the defendant
has proved an entrapment, it is permissible for the
government to show in rebuttal that the officer guilty
of incitement of the crime had reasonable cause to
believe the defendant was a person disposed to com-

mit the offense. This procedure is approved by the opinion of the court. The proof received in rebuttal usually amounts to no more than that the defendant had a bad reputation, or that he had been previously convicted. Is the statute upon which the indictment is based to be further construed as removing the defense of entrapment from such a defendant?

"Whatever may be the demerits of the defendant or his previous infractions of law these will not justify the instigation and creation of a new crime, as a means to reach him and punish him for his past misdemeanors. He has committed the crime in question, but, by supposition, only because of instigation and inducement by a government officer. To say that such conduct by an official of government is condoned and rendered innocuous by the fact that the defendant had a bad reputation or had previously transgressed is wholly to disregard the reason for refusing the processes of the court to consummate an abhorrent transaction. It is to discard the basis of the doctrine and in effect to weigh the equities as between the government and the defendant when there are in truth no equities belonging to the latter, and when the rule of action cannot rest on any estimate of the good which may come of the conviction of the offender by foul means. The accepted procedure, in effect, pivots conviction in such cases, not on the commission of the crime charged, but on the prior reputation or some former act or acts of the defendant not mentioned in the indictment."

In *Sherman, supra,* Justice Frankfurter, writing for four justices of the Court, adopted the views advanced by Justice Roberts in *Sorrells, supra.*

The factual situation confronting us here demonstrates the practical problems that arise when the majority test is employed. The basis of the entrapment defense is that the methods used by the police

are repugnant to fair play and justice. As the court
stated in *United States* v *Chisum,* 312 F Supp 1307,
1312 (CD Cal, 1970):

"Entrapment is indistinguishable from other law
enforcement practices which the courts have held to
violate due process. Entrapment is an affront to the
basic concepts of justice. Where it exists, law en-
forcement techniques become contrary to the estab-
lished law of the land as an impairment to due
process."

In an attempt to discourage these practices and
uphold "public confidence in the fair and honorable
administration of justice" (*Sherman* v *United
States, supra,* p 380 [Frankfurter, J.]), courts re-
fuse to allow convictions based on entrapment.
Thus, when the trial court ruled as a matter of law
that the defendant was entrapped into giving the
two cigarettes to the police officers, count one, sale,
was dismissed and the police were prevented from
obtaining a conviction based on their reprehensible
methods.

However, the defendant was still prosecuted for
possession. The two marijuana cigarettes obtained
purely as a result of illegal police conduct were the
sole basis of defendant's conviction. To allow the
conviction to stand, based on this evidence, is to sub-
vert the public policy rule behind the entrapment
defense. If the conviction stands, the police can
ignore with impunity the doctrine of entrapment in
narcotic cases. Citizens could be enticed and en-
trapped to give marijuana to police undercover
agents, using methods condemned by the Courts of
this state and our sister states.[37] While a court

[37] For examples of cases where the Courts have condemned
the use of entrapment, see *People* v *McCord,* 76 Mich 200, 205–206
(1889); *People* v *Pinkerton,* 79 Mich 110 (1889); *United States* v
*Adams,* 59 F 674 (D Ore, 1894); *Woo Wai* v *United States,* 223 F

might dismiss the information based on sale, it would still allow the evidence obtained by repugnant methods to be used as the basis of a conviction for possession.

In other areas of the law, the Courts have fashioned exclusionary rules against the use of evidence obtained by means of illegal police conduct. *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081; 84 ALR2d 933 (1961); *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

The people contend that the exclusionary rules set out in *Mapp* and *Miranda* are not applicable to this case because they involve specific constitutional rights.[38] However, there are examples of both state and Federal cases where exclusionary rules have been fashioned under the general supervisory powers of the court.

To illustrate, in *McNabb v United States,* 318 US 332; 63 S Ct 608; 87 L Ed 819 (1943), the United States Supreme Court excluded from evidence a confession obtained from defendant. Although the Court held that the confession was not involuntary in the sense that it was factually incorrect, nevertheless the Court felt that it should not be allowed into evidence because to do so would be to countenance reprehensible methods of interrogation. The court based this on its specific supervisory powers over procedure in Federal courts.

Likewise in a situation analagous to *McNabb,* our Court applied the same rule depending on its supervisory powers over the courts in *People v Ham-*

412, 415 (CA 9, 1915); *Butts v United States,* 273 F 35, 37–38 (CA 8, 1921); *State v Neely,* 90 Mont 199; 300 P 561 (1931), and *Evanston v Meyers,* 70 Ill App 205, 207 (1897).

[38] *Mapp* involved the Fourth Amendment right to be free from unreasonable search and seizure. *Miranda* involved the Fifth Amendment right of freedom from self-incrimination and the right to counsel in criminal proceedings guaranteed by the Sixth Amendment.

*ilton,* 359 Mich 410, 411 (1960). In *Hamilton,* Justice Black, speaking for a unanimous Court, relied on United States Supreme Court cases which stated:

" 'The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false.' *Lisenba* v *California,* 314 US 219, 236 (62 S Ct 280, 86 L ed 166 [1941]), quoted in *Blackburn* v *Alabama,* 361 US 199 (80 S Ct 274, 280, 4 L ed 2d 242, 248 [1960])."

Const 1963, art 6, § 5, grants to this Court general supervisory powers over the practice and procedure in this case.[39]   The excesses of police conduct which the Court in *Hamilton, supra,* held justified exclusion of evidence, were also present in this case.   The trial court found as a matter of law that defendant was entrapped into the sale.   This case is distinguishable from other entrapment cases where the courts did not exclude the evidence.[40]   We are dealing with a limited factual situation.   This occurs when a trial court has ruled as a matter of law that a defendant was entrapped into the sale of marijuana or narcotics.   In such circumstances, we hold that the evidence thus obtained through the illegal entrapment cannot be used to prosecute a defendant for possession of marijuana or narcotics.

In the case at bar, the trial court determined that defendant was entrapped into the sale of marijuana.

---

[39] "The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state.   The distinctions between law and equity proceedings shall, as far as practicable, be abolished.   The office of master in chancery is prohibited."

[40] In none of the cases cited by the people did the police engage in their efforts of entrapment over a prolonged period of time.   See *People* v *McIntyre,* 218 Mich 540 (1922); *People* v *Murn,* 220 Mich 555 (1922); *People* v *Christiansen,* 220 Mich 506 (1922); *People* v *England,* 221 Mich 607 (1923), and *People* v *Smith,* 296 Mich 176 (1941).

The same police misconduct (*ante* pp 100–102) that occurred in the sale of the marijuana was also involved in the possession. Defendant did not volunteer the two cigarettes to the undercover agents; he only gave the cigarettes to them after repeated requests by the officers, who had deceived him over a lengthy period of time.

We hold that on the facts of this case the two marijuana cigarettes should not have been admitted into evidence. The judgment is reversed and the defendant is discharged.

WILLIAMS, J. (*for reversal*). This is an opinion concerning a problem whose time has come. The name in the entitling is happenstance as the defendant could have been any mother's son or daughter.

The specific issue this opinion will consider is whether the categorization of marihuana in 1929 PA 310[1] along with the "hard drug" narcotics such as heroin, cocaine, and opium with the same penalty is denial of equal protection of the law because of unreasonable classification.

The defendant raised other issues such as entrapment and cruel and unusual punishment but inasmuch as the issue of equal protection is dispositive of the case neither those issues nor the factual details supporting them will be here considered. My Brother T. E. BRENNAN's opinion concerning the issue of cruel and unusual punishment is well-reasoned, and I am in agreement with it as far as it goes, but it goes only to the length of defendant's sentence, not to his conviction.

---

[1] 1923 PA 92, as amended by 1925 PA 9 was the forerunner of this act, but did not include marihuana as a narcotic drug. Marihuana was first grouped with the "hard drugs" in 1929. The act of 1929 has subsequently been amended in 1931 (PA No 172), in 1937 (PA No 343), in 1952 (PA No 266), in 1957 (PA No 63), and in 1961 (PA No 206).

For the purposes of this opinion the facts of the case are that the defendant prepared two marihuana cigarettes from a jar in his private quarters and handed them to two undercover police personnel. The defendant was subsequently charged on separate counts with sale and with possession of marihuana, the charge of sale being dismissed by the trial court because of entrapment. Defendant was tried, convicted, and sentenced to 9–1/2 to 10 years in prison.

The Court of Appeals affirmed the defendant's conviction in *People* v *Sinclair,* 30 Mich App 473 (1971). This Court granted the defendant's application for leave to appeal on September 1, 1971.

The Michigan statute penalizing the possession of marihuana is MCLA 335.153; MSA 18.1123. It was one of a number of state acts of similar type passed around the time of the passage of the Marihuana Tax Act in 1937.[2]

At the time of passage of the Marihuana Tax Act of 1937, marihuana was linked with heroin and other so-called "hard drugs" based on testimony indicating that marihuana was similarly dangerous. For example, in his testimony before the House Ways and Means Committee, Narcotics Commissioner Harry J. Anslinger relied on a number of authorities including a paper by Dr. Frank R. Gomila, at that time Commissioner of Public Safety of the City of New Orleans, and Miss Madeleine Gomila, Assistant City Chemist. That paper among other things said "we find that in comparison with other important habit-forming drugs, heroin, morphine, opium, and cocaine, marihuana has an established place".

---

[2] The passage of the Marihuana Tax Act of 1937 and numerous similar state statutes took place in a climate of ignorance and misconception. See *The Forbidden Fruit And The Tree of Knowledge: An Inquiry Into The Legal History of American Marijuana Prohibition,* 56 Va L Rev 971 (1970).

Taxation Of Marihuana-Hearings Before The Committee On Ways And Means, House of Representatives, 75th Cong. 1st Session on H.R. 6385, 1937, p 35.

The Commissioner made further points which are summarized by the Congressional Research Service (LRS, 13) as follows:

"1. A person under the influence of marihuana is dangerous behind the wheel of an automobile or while performing other functions which require coordination and judgment.

2. A habitual marihuana user is liable to commit a violent crime while under the influence of the drug.

3. Prolonged use of marihuana may produce 'mental deterioration' or even lead to insanity.

4. The drug may 'operate to destroy the will' and 'gradually weaken physical powers.' "

Based on such data it may not have been unreasonable for the Congress and the state legislatures at that time to have passed legislation coupling marihuana with opium and similar "hard drugs" in penal offenses. However, the situation today is quite the opposite. While experts cited in the briefs and appendices for plaintiff, defendant and *amici curiae* are not in complete agreement as to the exact properties of marihuana, it is quite clear that today few, if any, responsible experts would classify marihuana in the same category with opium and similar "hard drugs."[3]

---

[3] We are well aware of the great wealth of written material which exists concerning marihuana. The vast majority of these works are in agreement that marihuana is not a narcotic drug. We have relied upon the National Institute of Mental Health as the most authoritative spokesman for establishing this fact.

We have quoted the 1969 statement of Dr. Yolles, Director, National Institute of Mental Health, because it is the most pertinent comparison of marihuana with the hard drugs. However, since the original filing of this opinion, new authority has become available. The NIMH produced Second Annual Report to Congress from HEW (released February 11, 1972) continues to classify marihuana separate from hard drugs and states " * * *   there seems to be agreement

The United States Congress, particularly the House of Representatives, has been especially concerned with the properties and effects of marihuana, apparently in connection with H.R. 14012, a bill to provide for the establishment of a commission on marihuana. Stanley F. Yolles, M.D., Director of the National Institute of Mental Health appeared before the Sub-Committee on Public Health and Welfare of the Interstate and Foreign Commerce Committee on September 17, 1969, more than two years ago to testify on this general subject. His testimony establishes quite clearly that "in the past, dangerous drugs were grouped arbitrarily, sometimes by historical accident rather than with regard for their differing characteristics and their specific and distinct effects". He then went on to outline as well the

---

that physical dependence comparable to that produced by the opiates, alcohol and barbiturates does not exist with Cannabis" (p 190). This report incidentally notes the recent British report of cerebral atrophy in ten young cannabis smokers as serious but requiring further research as eight out of the ten youths were multiple drug users (pp 22–23).

We note also the findings of the National Commission on Marihuana and Drug Abuse. In its first report released on March 22, 1972, the Commission recommended as follows:

"I. Reclassification of Cannibis

"RECOMMENDATION: THE COMMISSION RECOGNIZES THAT SEVERAL STATE LEGISLATURES HAVE IMPROPERLY CLASSIFIED MARIHUANA AS A NARCOTIC, AND RECOMMENDS THAT THEY NOW REDEFINE MARIHUANA ACCORDING TO THE STANDARDS OF THE RECENTLY ADOPTED UNIFORM CONTROLLED SUBSTANCES LAW.

"Scientific evidence has clearly demonstrated that marihuana is not a narcotic drug, and the law should properly reflect this fact. Congress so recognized in the Comprehensive Drug Abuse Prevention and Control Act of 1970, as did The Conference of Commissioners on Uniform State Laws in the Uniform Controlled Substances Law.

"In those states where the Uniform Controlled Substances Law has not yet been adopted, twelve of which continue to classify marihuana as a 'narcotic', the Commission recommends that the legislatures distinguish marihuana from the opiates and list it in a separate category. The consequence of inappropriate definition is that the public continues to associate marihuana with the narcotics, such as heroin. The confusion resulting from this improper classification helps to perpetuate prejudices and misinformation about marihuana." *Marihuana, A Signal of Misunderstanding*, p. 177.

present significant knowledge concerning the characteristics of marihuana. This Court can certainly take judicial notice that the characteristics of marihuana are quite different from narcotic drugs like heroin.

Dr. Yolles discusses this in his statement in brief form. The pertinent part of Dr. Yolles' statement is as follows:

"In the past, dangerous drugs were grouped arbitrarily, sometimes by historical accident rather than with regard for their differing characteristics and their specific and distinct effects. The bill before you today, Mr. Chairman, if read in conjunction with H.R. 13742, now before the House Ways and Means Committee, would provide for the first time a more logical grouping of substances according to the degree of danger in the abuse of each. It also wisely requires all decisions to add, delete, or reclassify a substance to be made by the Attorney General *only after* obtaining the advice of the Secretary of Health, Education, and Welfare, and of the Attorney General's own scientific Committee.

"There is one comment which I must make with regard to the content of the schedules. One substance which I know is being considered by another House Committee—because through historical accident it has been traditionally regulated as a narcotic —is marihuana.

*"There is total agreement among competent scientists and physicians that marihuana is not a narcotic drug like heroin or morphine but rather a mild hallucinogen. To equate its risks—either to the individual or to society—with the risks inherent in the use of hard narcotics is neither medically nor legally defensible.* I am certainly not advocating the removal of all restrictions on marihuana. It can be a dangerous drug. We need to know much more about the long-term effects of marijuana and other

forms of Cannabis, particularly the more potent hashish. Based on what we already *do* know about the substance, however, it should not be dealt with, legally or medically, as a narcotic." (Emphasis supplied.)

\* \* \*

"Mr. Chairman, the patterns of marihuana use, as well as the properties of the drug, are very different from other substances under consideration here. No one really knows how many people smoke marihuana in the United States today. From collegiate studies and other sources, it can be estimated that the number of people who have smoked marihuana at least once is something between 8 and 12 million; and it may be closer to 20 million.[4]

"The marihuana debate continues but the differences between the facts about marihuana and the fables surrounding its use are now much more widely recognized than was the case even six months ago."

The above data indicates that factually the categorization of marihuana with narcotics and other "hard drugs" is not a reasonable classification.

The United States Constitution[5] and the Michigan Constitution[6] each guarantee every citizen of the State of Michigan the equal protection of the law. Both the United States Supreme Court and this Court have held that a classification which does not rest upon a reasonable basis and which is essentially arbitrary in nature constitutes a violation of the Equal Protection Clause. *Lindsley* v *Natural Carbonic Gas Co,* 220 US 61; 55 L Ed 369; 31 S Ct 337 (1911); *Naudzius* v *Lahr,* 253 Mich 216 (1931).

Recent cases have outlined a stricter test in certain cases involving an interpretation of the Equal

---

[4] A recent nationwide survey revealed that 61.7% of the country's college students have used marihuana at least once. Over one-third of the students, 38.6%, stated they had used marihuana 10 or more times. "Playboy's Student Survey: 1971."

[5] US Const, Am XIV.

[6] Const 1963, art 1, § 2.

Protection Clause. These cases have held that when a fundamental constitutional right is in question, any classification which penalizes the exercise of that right is unconstitutional unless it is necessary "to promote a compelling governmental interest". *Shapiro* v *Thompson,* 394 US 618, 634; 89 S Ct 1322; 22 L Ed 2d 600 (1969); *Traverse City School District* v *Attorney General,* 384 Mich 390 (1971).

Under either of the above standards the classification of marihuana as a "hard drug" in MCLA 335.151; MSA 18.1121, constitutes a violation of the Equal Protection Clause of the United States Constitution. Such a classification is irrational in view of the present evidence which exists concerning marihuana. This is particularly true since other hallucinogenic drugs such as d-lysergic acid diethylamide, peyote, and mescaline are grouped together. (MCLA 335.106; MSA 18.1106). The penalties for the use of these drugs are less severe than those for the possession of the narcotic drugs with which marihuana is included. This classification promotes no "compelling governmental interest". Therefore such classification of marihuana deprived the defendant of his constitutional right to equal protection of the law.

The Supreme Court of the State of Illinois recently considered this same issue in its review of a case involving an Illinois statute classifying marihuana with narcotic drugs. In *People* v *McCabe,* 49 Ill 2d 338; 275 NE2d 407 (1971), that Court stated, "Marijuana, in terms of abuse characteristics, shares much more in common with the barbiturates, amphetamines and, particularly, the hallucinogens than it does with the 'hard drugs' classified in the Narcotic Drug Act". 49 Ill 2d 338. The Court concluded that the grouping of marihuana

with narcotic drugs was irrational and violated the Equal Protection Clause.

It is of interest to note that the Michigan legislature itself has decided that the classification of marihuana with narcotics and other so-called "hard drugs" is not rational in the light of present scientific knowledge. The legislature has removed marihuana from the category containing "hard drugs", and has lowered the penalties for the marihuana crimes.[7]

The legislature also has recognized the problem arising from the fact that the Controlled Substances Act of 1971 may only be applied prospectively. Aware of its inability to pass a retrospective law, the legislature has wisely called for a committee to review the sentences of those individuals presently incarcerated for drug offenses. Such a committee can make recommendations concerning the commutation of sentences to the Governor. Unlike the legislature, however, this Court does have the authority to apply its decisions retrospectively. Justice demands that we so apply this decision.

The legislature's action is in line with the following conclusion reached by the United States House of Representatives Select Committee On Crime which in their April 6, 1970 report (91st Congress, 2nd Session H.R. 91–978), concluded as follows:

"Certainly, savagely repressive and punitive laws cannot be defended as a solution to the marihuana problem. It destroys our criminal justice system to have penal statutes that are not uniformly enforced —and perhaps in some instances are unenforceable. Our committee heard many general statements of harsh and oppressive prison sentences that had been meted out to young marihuana users or possessors.

[7] See the Controlled Substances Act of 1971, effective April 1, 1972.

Many lament that we are 'making criminals of our young people.' The facts, however, do not support these statements. We have observed that the penalties for marihuana possession or even for selling are generally not imposed and that jail sentences are the rare exception rather than the rule.

"This situation is not desirable. Our criminal statutes must be uniformly enforced or they make a mockery of the effective administration of criminal justice. Nothing brings about a disrespect for the law more effectively than penal statutes which are selectively enforced. Those who receive the penalty which the law provides rightfully feel discriminated against if most violators go free. A major and perhaps the most serious need in relation to marihuana is to make the penalties relating to violations rational and then to bring about uniform and even enforcement of the laws. No society can exist if disrespect for its laws is widespread."

Reversed, defendant discharged.

T. M. KAVANAGH, C. J., concurred with WILLIAMS, J.

T. G. KAVANAGH, J. John Sinclair was convicted of the crime of possession of marijuana contrary to the provisions of MCLA 335.153; MSA 18.1123, and was sentenced to serve 9–1/2 to 10 years in prison therefor.

I agree with my Brother BRENNAN that a minimum sentence of 9–1/2 years for the possession of marijuana is cruel and/or unusual punishment prohibited by the US Const, Am VIII and the Const 1963, art 1, § 16, for the reasons he states.

I also agree for the reasons he states, that in the discharge of our duty we have the power to review sentences.

I do not agree that the other issues urged on appeal here were adequately treated by the Court of Appeals or that on the basis of their reasoning—or any other—that the conviction can stand.

My Brother SWAINSON has written that the police procedure followed in this case was tantamount to entrapment and does not meet a standard of practice which we can countenance. I agree with him in this for his stated reasons. His quotations from Justice MARSTON and CAMPBELL in *Saunders* v *People,* 38 Mich 218 (1878), and Justice Roberts in *Sorrells* v *United States,* 287 US 435; 53 S Ct 210; 77 L Ed 413 (1932) strike me as most apt.

Here because of the way it was obtained, the evidence should have been suppressed for all purposes, so defendant's conviction based upon it was improper.

My Brothers WILLIAMS and SWAINSON, however, both write to the effect that our statute denied the defendant equal protection and due process of the law on account of its classification of marijuana with heroin and other "hard narcotics", prescribing the same penalty for their possession and use. They demonstrate that the overwhelming weight of scientific opinion today is that marijuana is not a narcotic at all, but rather a mild hallucinogens which should, with propriety, be treated with other hallucinogens. They hold that classification of marijuana with the "hard" drugs is wholly unreasonable and unconstitutional.

Although I am persuaded that our statute is unconstitutional, I cannot agree that my Brothers have ascribed the correct or even permissible reasons for this conclusion.

The testimony and data upon which this legislation was based may indeed be out of date and of exceedingly doubtful validity today, but I do not per-

ceive it the prerogative of a court to substitute its assessment of such testimony and data for that of a legislature. Rather I believe our duty is to determine whether what the legislature *did* conformed to constitutional limits.

I find that our statute violates the Federal and State Constitutions in that it is an impermissible intrusion on the fundamental rights to liberty and the pursuit of happiness, and is an unwarranted interference with the right to possess and use private property.

As I understand our constitutional concept of government, an individual is free to do whatever he pleases, so long as he does not interfere with the rights of his neighbor or of society, and no government—state or Federal— has been ceded the authority to interfere with that freedom. As has been said:

"[T]he sole end for which mankind are warranted, individually or collectively, in interfering with the liberty of action of any of these number, is self-protection. That the only purpose for which power can be rightfully exercised over any member of a civilized community, against his will, is to prevent harm to others. His own good, either physical or moral is not a sufficient warrant." J. S. Mill, *On Liberty,* Chapter 1.

Whatever the validity of the concept that *traffic* in marijuana is freighted with a proper public interest, it is extending the concept entirely too far to sanction proscription of possession and private use of it. Although it is conceivable that some legitimate public interest might warrant state interference with what an individual consumes, "Big Brother" cannot, in the name of *Public* health, dictate to anyone what he can eat or drink or smoke in the *privacy* of his own home.

In my view when the legislature proscribed the possession and private use of marijuana as a *Public* health measure it did so unconstitutionally.

John Sinclair's conviction should be set aside and the prosecution dismissed.

T. E. Brennan, J. (*Separate Opinion*). Defendant was convicted of possession of two marijuana cigarettes in violation of MCLA 335.153; MSA 18.1123.

The offense occurred in the defendant's home, and in the presence of two police officers whose identity as such was unknown to the defendant.

Defendant did not testify at his trial.

On July 28, 1969, defendant, in the company of his attorney, appeared before the trial judge for sentencing.

The following is a transcript of that hearing:

"*The Clerk:* File No. A-134588, People vs. John A. Sinclair. You were found guilty by a jury July 25th of Possession of Marijuana. You are here today for sentence. Do you have anything to say to the Court?

"*The Defendant:* I do.

"*The Clerk:* Speak up.

"*The Court:* You want the microphone, Mr. Sinclair?

"*The Defendant:* Not particularly.

"*The Court:* All right.

"*The Defendant:* I haven't had a chance to say anything and so far I'd like to say a few things for the record. The Court is aware these charges have been fabricated against me by the Detroit Narcotic Squad. He came to me one day and said a month and three days ago, you did this, you gave so and so this, you did that. I had no opportunity, I didn't do that and I had no opportunity to construct a defense. But I know what was going on all along and

it was a conspiracy by these people, Warner String-fellow, Vahan Kapagian and Joseph Brown and the rest of them, to frame me on this case and to bring me right here and to manufacture two marijuana cigarettes and say I gave them to them and then let the rest of you who are in it with them manufacture this cold case and bring me here. The punishment I have received already in the two and a half years since this case started is cruel and unusual, if I had committed the crime of possessing two marijuana cigarettes. And everyone who is taking a part of this is guilty of violating the United States Constitution and violating my rights and everyone else's that's concerned. And to take me and put me in a pigsty like the Wayne County Jail for the weekend is a cruel and unusual punishment, to sleep on the floor, to have no sheets, no blankets, pig swill to eat. You see, but you can get away with this and you can continue—I don't know what sentence you are going to give me, it's going to be ridiculous, whatever it is. And I am going to continue to fight it. The people are going to continue to fight it because this isn't justice. There is nothing just about their, there is nothing just about these courts, nothing just about these vultures over here.

"*The Court:* One more word out of the crowd and I will clear the courtroom.

"*The Defendant:* Right. And that will continue in the tradition that's been established here. I am not done, but no sense talking any more.

"*Mr. Ravitz [attorney for defendant]:* If your Honor please, Mr. Sinclair is twenty-seven years of age, he is married, he has one child in the audience today, two years of age. A beautiful child, she is there. His wife is pregnant. He's lived in the State of Michigan all his life. He has three prior convictions, two are for marijuana. In each instance, he pled guilty. In the second instance, he never, ever should have pled guilty. It was the subject of illegal entrapment by Vahan Kapagian. He

was induced, he was seduced, he was led by Kapa-gian to be an intermediary. To be an intermediary to a transaction which he never would have been a party to. To be an intermediary to a transaction which the major person on both sides of the trans-action were, of course, not charged with an offense.

"John Sinclair stands convicted in Oakland Coun-ty of assaulting a police officer who wasn't even a police officer. Of assaulting a person who assaulted him. He's been given a sentence of thirty days in that case, which is on appeal. The Court knows something about the history of cases involving al-leged assaults upon police officers where the alleged assailants were persons of the nature of John Sin-clair.

"If there are two crimes in this country which are political prosecutions, they are in one instance, those of claimed assaults against police officers and in another instance, those cases which can be proved easily by fabricated stories and not easily disproved by citizens. Namely, offenses such as the one before this Court.

"John Sinclair has another pending case. That pending case is an oddity in the annals of jurispru-dence in this country or anywhere else. That case is for violation of the Federal law, which is on its face, palpably unconstitutional. It stated as many as twelve years ago in the case of Lamberg versus California, by the Supreme Court, I wonder who it was who came up with the clever notion of saying that John Sinclair is a criminal because he kept a business engagement in another state, in Canada, and went across the line not registering as a person convicted of a narcotic offense? Who else has been charged with that case and when and who is behind that case? I wonder? But one need not wonder, one need only look. The community's attitude and the establishment's attitude and the narcotics offi-cer's attitude and the unmitigated power which they have to exercise. The only way that power can be

checked is by having an independent judiciary. The only way that power can be checked is by having jurors who aren't going to be servants to police state power that are going to stand as a bullwark against the improper exercise of that power. And we don't have that in America today. We didn't have that in this court this past week and that's regrettable.

"In America, which has never known anything but the history of racism, and in America which practices those imperialistic and those brutalistic and inhumane wars in Asia and elsewhere around the globe, and in America which sends a man to the moon while millions of its citizens starve, John Sinclair is brought before this Court and he is said to be a criminal. He isn't a criminal. He isn't a criminal at all. The criminals with respect to this law, are the doctors, the legislators, the attorneys who know, who know, because they have knowledge that these laws are unconstitutional. That these laws defy all knowledge of science. That this sumptuary legislation, like its predecessors and like other forms of sumptuary legislation, are on the books to go after and to impress politically unpopular people and groups and minorities. That's the only reason they are on the books.

"This very day, 25% of the future doctors of America who are studying medicine at Wayne State University Medical School, have possessed marijuana. Twenty-five percent of the future lawyers, indeed future judges who will be sitting on that bench some day, have possessed and have smoked marijuana.

"*The Court:* That's your opinion.

"*Mr. Ravitz:* That's my opinion.

"*The Defendant:* That's a fact.

"*Mr. Ravitz:* My opinion and based on studies.

"Persons brought before the bar of the Court aren't the middle-class, aren't the popular, they are the oppressed. They are the unpopular. It's a

terrible law, it's a criminal law. I know that the
Court might not agree with my evaluation of it. I
know and ask and hope for only this, your Honor. I
think the Court has been involved in enough of these
cases to know that the law itself, whether it's uncon-
stitutional per se, is a cruel law and isn't a law that
is properly and fairly dispensed. I know that the
Court, and I hope that the Court recognizes that the
two cigarettes in this case were really—the officers
in this case really had utter disregard for John
Sinclair. They never treated him as a human being
to whom the Constitution extended itself. What I
really hope the Court recognizes is that other judges
and other persons of this society charged with re-
sponsibilities, come to recognize is that America
cannot single out unpopular leaders and go into
their arsenal of over-kill, be it through stone or
rifles or highly punitive sentences and think that the
problems in this country can ever be solved in that
fashion. Yet all around this country, we see politi-
cal prosecutions. We see the Tom Haydens, we see
the Huey Newtons, the John Sinclairs singled out.
And somewhere in the warped minds of those so-
called leaders, they think that they are going to cure
the generation gap. They think that they are going
to stem the tide of revolution by picking out leaders.
Well, they are simply not going to do so because
leaders are no longer indispensable in this country.
Because there are a great many people who are
awake to the crimes and the atrocities committed by
governments and because it simply cannot work.
The only way to deal with it is to deal with it ration-
ally, to deal with it constitutionally and to follow
those laws written by those legislators. And I will
ask that the Court do just that. And I would ask
that the Court insulate itself from public pressures
which I recognize to be very weighty. But to be
equally irrational. Those are the same public pres-
sures that lead to all those acts that called for the
conclusions brought forward in the Kerner Commis-

sion Report. And yet those conclusions haven't been acted on in any way by government. I hope that this Court in particular begins to act upon them by exercising some degree of rational thought process and by recognizing the realities of the situation.

"Thank you.

*"The Court:* Well, in this matter here, Mr. Sinclair was arrested in January of 1967 in connection with an offense that took place on December 22nd, 1966. It's interesting to me that he, and you, assert that he has been violated of his constitutional rights because all of the rights that he's entitled to as any citizen is under the Constitution, have been asserted in his defense. In addition to that, there have been appeals to the Court of Appeals, to the Michigan Supreme Court on his behalf, which have held up the trial of this case for a long and lengthy period of time.

"Now, Mr. Sinclair is not on trial and never was on trial in this courtroom because of his beliefs. He represents a person who has deliberately flaunted and scoffed at the law. He may think that there is nothing wrong with the use of narcotics, as many people think that there is nothing wrong with the use of narcotics. Although enlightened and intelligent people think to the contrary and otherwise. And medical studies back them up far more completely than they do the people on his side of the particular question.

"The public has recognized that the use of narcotics is dangerous to the people that use it. The public, through its legislature has set penalties for those who violate and traffic in narcotics.

"Now, this man started in 1964, in which he first came to the attention of this Court and upon the offense of Possession of Narcotics, on a plea of guilty, was placed upon probation. We have tried to understand John Sinclair, we have tried to reform and rehabilitate John Sinclair.

"In 1966, while still on probation for that offense, he committed another offense for which he pleaded guilty. And this Court again showed supreme leniency to John Sinclair, placing him on probation again while ordering him to serve the first six months thereof in the Detroit House of Correction.

"This placed him in violation of his other probation, which resulted in that Judge extending that probation on again, so that for you or for John Sinclair to assert that the law has been out to get him, is sheer nonsense. John Sinclair has been out to show that the law means nothing to him and to his ilk. And that they can violate the law with impunity and the law can't do anything about it.

"Well, the time has come. The day has come. And you may laugh, Mr. Sinclair, but you will have a long time to laugh about it. Because it is the judgment of this Court that you, John Sinclair, stand committed to the State Prison at Southern Michigan at Jackson or such other institution as the Michigan Corrections Commission may designate for a minimum term of not less than nine and a half nor more than ten years. The Court makes no recommendation upon the sentence other than the fact that you will be credited for the two days you spent in the County Jail.

"Now, as to bond, in view of the fact that Mr. Sinclair shows a propensity and a willingness to further commit the same type of offenses while on bond, and I am citing you to the case of People versus Vita [*sic*] Giacalone just cited by the Michigan Court of Appeals, this is one instance where there is a likelihood of that type of danger and which the Court of Appeals said that refusal to set bond is a good grounds. And based on that, and my belief that he will continue to violate the law and flaunt the law in relation to narcotics, I deny bond pending appeal.

"*The Defendant*: You just exposed yourself even

more. And people know that. You give somebody nine and a half to ten years—(noise in courtroom)."

Statistics of the Michigan Department of Corrections show that since 1964, 1,663 persons have been convicted in Michigan for violation of MCLA 335-.153; MSA 18.1123.* Of these, 214 were given short jail terms, fined or given suspended sentences. Nine hundred and eighty-two were placed on probation. Four hundred and sixty-seven were committed to prison.

Of the 467 sent to prison, only 46 received minimum terms exceeding five years. Only 5 persons have been committed to prison for minimum terms of 9–1/2 years, or more, for possession of any amount or species of narcotics since 1964.

Defendant appeals his conviction and sentence on many grounds. All of these have been dealt with adequately by the Court of Appeals, with one exception.

That issue is this: Whether under the circumstances of this case, the imposition of a minimum term of imprisonment of 9–1/2 years is prohibited by the US Const, Am VIII, or Const 1963, art 1, § 16.

The US Const, Am VIII, provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Const 1963, art 1, § 16, provides:

"Excessive bail shall not be required; excessive fines shall not be imposed; cruel or unusual punishment shall not be inflicted; nor shall witnesses be unreasonably detained."

*Cummins* v *People,* 42 Mich 142 (1879), was sub-

---

* State of Michigan, Department of Corrections, Criminal Statistics (1964–1970).

mitted to the Supreme Court on October 29, 1879, and decided the next day. It involved:

"Burglary. Criminal information charging George Linden, Michael Moore, William Cummins and John Seipher with breaking into the dwelling house of Anne McFarlin, in the township of Hamtramck, and feloniously taking therefrom a bottle of sherry and a lot of cigars. Cummins was convicted and sentenced to imprisonment in the State Prison for seven years."

The Court, held, without citation of precedents:

"It is also alleged as error that the sentence was unusually severe, and that in the light of all the facts it was in violation of the constitutional provision which declares that 'cruel or unusual punishment shall not be inflicted.' The sentence was not in excess of that permitted by statute, and when within the statute, this court has no supervisory control over the punishment that shall be inflicted. The statute gives a wide discretionary power to the trial court upon the supposition that it will be judicially exercised in view of all the facts and circumstances appearing on the trial. Unless the case presented differed materially from what it would appear to have been, as shown by the bill of exceptions, we think the punishment inflicted was unusually severe, and have no doubt but that on a full presentation of the facts to the chief Executive, relief would be promptly and cheerfully granted."

In *Robison* v *Miner*, 68 Mich 549 (1888), a provision of the liquor law of 1887 calling for forfeiture of business in addition to fine and imprisonment was struck down as cruel or unusual punishment.

*People* v *Murray*, 72 Mich 10 (1888), was a case in which:

"The respondent in this case was convicted in the Kalamazoo circuit on February 28, 1888, of the

crime of carnally knowing and abusing a young girl under the age of 14 years, and was sentenced to imprisonment at Jackson for the term of 50 years."

The reported decision contains a detailed description of the events which led to the arrest and conviction of the defendant Murray, concluding with these words (p 13):

"The case does not show the aggravating circumstances which so frequently accompany criminal conduct of the character charged, and especially is this true when we consider the intoxicated condition of the respondent. While this cannot furnish any legal excuse for what he did, it has an important bearing upon the turpitude of the respondent, and the quality of his crime, and should have had an important influence in determining the extent of the punishment to be inflicted after conviction had. Such considerations, however, seem to have been entirely without weight with the court below, as is very clearly manifest from the extent of the punishment meted out to the respondent."

In *Murray,* the Court found errors in the trial, and directed remand for new trial.

But the Court also directed its attention to the punishment issue, in these words (pp 16–17):

"There is another feature of this case to which we wish to call special attention, and that relates to the sentence imposed. It is for 50 years, and will very likely reach beyond the natural life of the respondent, unrestrained of his liberty, and overreach by 10 or 15 years his natural life if so restrained. We see nothing in this record warranting any such sentence, and it must be regarded as excessive. It will not do to say the executive may apply the remedy in such a case. We do not know what the executive may do, and it is but a poor commentary upon the judiciary when it becomes necessary for the executive to regulate the humanity of the bench.

"But the Constitution has not left the liberty of the citizen of any state entirely to the indiscretion or caprice of its judiciary, but enjoins upon all that unusual punishments shall not be inflicted. Where the punishment for an offense is for a term of years, to be fixed by the judge, it should never be made to extend beyond the average period of persons in prison life, which seldom exceeds 25 years.

"We are all of opinion that the present case shows an abuse of the discretion vested by the statute in the circuit judge in this respect."

The *Murray* decision makes no reference to *Cummins,* although it is clear that the Court took a very different view of the strictures of the cruel and unusual punishment prohibition in the two cases.

In *People* v *Morris,* 80 Mich 634 (1890), there is a rather extensive discussion of cruel or unusual punishment. There, two defendants pled guilty to larceny of a horse, and were sentenced to seven years and six years nine months, respectively. The statute on horse theft carried a minimum sentence of 3 and a maximum sentence of 15 years.

It was alleged in *Morris* that the statute was unconstitutional. No claim seems to have been made, as in *Murray,* that the sentence itself constituted the infliction of cruel or unusual punishment.

The historical discussion in *Morris* discloses that the precursor of our constitutional ban on cruel or unusual punishment was originally aimed at the infliction of punishments by judges, and was not a limitation upon the legislative branch of government in defining crimes and declaring punishments.

" 'We first find the injunction against cruel and unusual punishment in the Declaration of Rights, presented by the convention to William and Mary before settling the crown upon them in 1688. That declaration recites the crimes and errors which had

made the revolution necessary. These recitals consist of the acts only of the former king and the judges appointed by him, and one of them was that "illegal and cruel punishment had been inflicted." * * * The punishments complained of were the pillories, slittings, and mutilations which the corrupt judges of King James had inflicted without warrant of law, and the declaration was aimed at the acts of the executive; for the judges appointed by him, and removable at pleasure, were practically part of the executive. It clearly did not then refer to the degree of punishment, for the criminal law of England was at that time disgraced by the infliction of the very gravest punishment for slight offenses, even petit larceny then being punishable with death. But the declaration was intended to forbid the imposition of punishment of a kind not known to the law, or not warranted by the law.' " (p 638.)

While the Court in *Morris* was only asked to consider the constitutionality of the statute, nonetheless, the Court repeated the *Cummins* rule that any sentence within the statutory limits was beyond appellate consideration.

"But for the disposition of this case we may adopt the rule contended for, and then we must find (in order to declare the law unconstitutional) that the minimum punishment provided by the law is so disproportionate to the offense as to shock [*sic*] the moral sense of the people. Imprisonment for larceny is, and always has been, in this country and in all civilized countries, one of the methods of punishment. There may be circumstances surrounding the commission of larceny where fifteen years would not be considered too severe a punishment. When punishment is commensurate with the depravity of the criminal, as shown in the commission of the act, justice is done. Under most of our criminal laws, cases may arise where the punishment inflicted might be considered cruel, but that does not con-

demn the law. The judge in such case has acted within the jurisdiction of constitutional law, and other means must be resorted to to right the wrong. Appellate courts cannot interfere if the proceedings have been regular. The law itself must therefore be cruel or unusual to warrant the interposition of the courts." (p 639.)

The *Morris* Court also pointed out that the act of stealing a horse was *malum in se*. Details of the horse theft were not recounted.

The *Cummins* rule was followed again in *People v Cook,* 147 Mich 127 (1907). There a statute calling for indeterminate sentences was upheld. The Court said (p 133):

"The law does not provide for any unusual punishment. The legislature may fix one definite punishment for any crime, or it may fix a minimum and a maximum. When a constitutional law has fixed the punishment for an offense, a sentence under that law is not cruel or unusual within the meaning of the Constitution. One judge might sentence a man convicted of larceny for one year, and another might sentence the same man for the same offense for five years. When the judge imposes a sentence within the law, his sentence is not a cruel or unusual punishment. It is laws providing for cruel and unusual punishments that the Constitution refers to and prohibits, and not sentences by courts under constitutional laws."

*People v Mire,* 173 Mich 357 (1912), dealt with a conviction of burglary with explosives. The defendant there argued that the statute provided a cruel and unusual punishment. Affirming the sentence, the Court said (p 361):

"The punishment prescribed in the act in question is imprisonment, a most common and usual method of punishment the world over. The claim that it is

cruel and unusual must of necessity be directed, not to its nature, but to its limits of time, 'not less than 15 years nor more than 30.' That class of cruel and now unusual punishments at one time sanctioned and prevalent under the common law of England, such as burning at the stake, drawing and quartering, mutilation, starvation, and lesser forms of physical torture, to which the constitutional prohibitions were primarily directed, is not involved here. Approaching the dividing line, the inquiry as to what does in any particular case constitute cruel and unusual punishment under the constitutional provisions, turns, not only upon the facts, circumstances, and kind of punishment itself, but upon the nature of the act which is to be punished."

As in *Morris,* the Court agreed that the minimum term was the measure of the constitutionality of a punishment statute.

"We are not prepared to hold that the punishment prescribed in this act does not fit the crime, or that the minimum punishment, which is the test, should be regarded as so unusual and cruel, and so disproportionate to the offense as to shock the moral sense of the public."   (p 362.)

Also following the lead of *Morris,* the Court in *Mire* discussed the legislative rationale, pointing out the peculiar dangers inherent in the use of explosives.

*People* v *Smith,* 94 Mich 644 (1893), and *People* v *Whitney,* 105 Mich 622 (1895), are both cases in which the constitutionality of legislatively determined punishments were considered and upheld. In both cases, the Court said "upon the Legislature alone is conferred the power to fix the minimum and maximum of the punishment for all crimes."

In *People* v *Baum,* 251 Mich 187 (1930), defendant was convicted of violation of the liquor laws, sen-

tenced to pay a fine of $500 and $500 costs. In
addition, defendant was placed on probation for five
years, during which time it was ordered that he
"must leave the State of Michigan within 30 days
and not return for the period of probation". It was
held that such a method of punishment was implied-
ly prohibited by public policy. The case was re-
manded with instructions to enter a legal sentence.

In *People* v *Jagosz*, 253 Mich 290 (1931), defend-
ant was convicted of rape. There was no discussion
of the basis for the claim that the sentence imposed
was cruel or unusual. The Court said (p 292):

"It is claimed that the sentences to imprisonment
from 12 to 30 years constitute cruel and unusual
punishment. There is no merit in this. The statute
(3 Comp Laws 1915, § 15211 [3 Comp Laws 1929,
§ 16727]) provides imprisonment for life or any
such period as the court in its discretion shall
direct."

In *People* v *Harwood*, 286 Mich 96 (1938), defend-
ant was sentenced 5 to 15 years for placing a foul
and offensive substance in a taxicab, rendering it
unuseable for two weeks.

The Court cited United States Supreme Court
cases to support its finding that the Eighth Amend-
ment did not apply to the states, then, without dis-
cussing the similar provision of the Michigan Con-
stitution, affirmed the conviction on the ground that
the "length of imprisonment for felony is for legis-
lative determination and not subject to judicial
supervision." Citing *Morris, Smith* and *Whitney*.

Defendant appealed his conviction of rape in
*People* v *Commack*, 317 Mich 410 (1947). This was
a delayed appeal in which there appeared to have
been some possibility of doubt as to the defendant's
guilt, based upon certain after discovered evidence.

Defendant's appellate counsel asked to withdraw because he did not wish to be a party to a fraud on the Court. Thereafter, the Court made short shrift of the appeal, and disposed of the cruel and unusual argument with the simple statement that the sentence was within the statutory limits, and was not "cruel, inhuman and unjust punishment in view of the nature of the crime charged."

*In re DeMeerleer,* 323 Mich 287 (1948), imposed a sentence of 6 months to 15 years for manslaughter. The Court reiterated the holding of *Harwood* without discussion.

Defendant was sentenced to a minimum term of eight years in *People* v *Connor,* 348 Mich 456 (1957). He challenged the sentence as an abuse of discretion. The Court there held:

"The sentence imposed is within the penalty imposed by statute. In such cases the Supreme Court is without power to alter or change a sentence."

In *People* v *Krum,* 374 Mich 356 (1965), defendant was convicted of obstructing an officer. He claimed that his sentence of 30 days in jail, $1,000 fine and $346.20 in costs, was grossly excessive under all the circumstances and taking account of his past exemplary record. That claim was disposed of with one sentence:

"As to the claim that the sentence was excessive, it is found to be within the limits set by the statute, and that precludes our altering it."

It is apparent that our cases on the subject of cruel or unusual punishments have not considered the parameters of the constitutional prohibition in any great depth.

It is clear from *Murray, Miner* and *Baum* that the Court does have, and will occasionally exercise authority to vacate sentences which are illegal. But

it is also clear that our Court has consistently declined to consider punishments challenged as being cruel and unusual where the sentence is within the range permitted by statute.

The conclusion that the prohibitions of the Eighth Amendment and of Const 1963, art 1, § 16, are directed only to legislative acts and not judicial actions, does not seem warranted.

As pointed out in *Morris,* the history of the "cruel and unusual" punishment bar was otherwise. Moreover, the punishments prohibited by the Constitution are those "inflicted" and not those permitted or authorized by law. The prohibition against "excessive bail" would seem obviously directed against courts and judges who set bail, and not against legislatures which ordinarily leave the amount of bail to judicial discretion.

Further, the action of state courts has been held to constitute state action within the meaning of the Fourteenth Amendment. *Shelley* v *Kraemer,* 334 US 1; 68 S Ct 836; 92 L Ed 1161; 3 ALR2d 441 (1948).

Since the Eighth Amendment has now been held applicable to the states, via the Fourteenth Amendment (Robison v California, 370 US 660 [82 S Ct 1417; 8 L Ed 2d 758 (1966)]), it would follow that the sentence imposed by a state court, could be made the basis for a Federal claim, even though state legislative action is not challenged.

Where the legislature provides an indeterminate sentence, which contains no minimum term, the constitutionality of the legislation would have to be determined on the basis of the maximum penalty established. In such a case, a showing would have to be made that no set of facts could be posited under which the commission of the crime defined in

the law would warrant the imposition of the maximum penalty.

In such a case, the legislature leaves the setting of the minimum sentence to the court for the very purpose of creating latitude so as to relieve from the maximum penalty those defendants whose conduct contained some circumstances of mitigation, or at least no circumstances of aggravation.

But it does not follow that because the legislature has left the setting of the minimum term to the courts, no minimum term can ever be excessive.

We reject the proposition that punishments can be "cruel and unusual" in the popular sense, but not in the constitutional sense. The Constitution is a popular document. It must be construed by the courts to have that meaning which the people intended it to have.

It is ludicrous to suppose that the people who prohibited excessive fines and bail and cruel or unusual punishment intended thereby to vest unbridled power in judges to require bail, impose fines and inflict punishments.

It is equally unrealistic to conclude that the people intended to permit the legislature to give such unbridled power to the trial courts in the name of indeterminate sentencing.

Many examples could be given in which maximum statutory punishments are at variance with the realities of the administration of justice.

Traffic violations, for instance, are punishable under the motor vehicle code as misdemeanors, carrying a maximum of 90 days in jail and $100 fine.

While certain aggravated circumstances might be supposed justifying such penalties in some cases, it would be shocking indeed if the maximum penalty should be meted out for a commonplace left turn violation!

Surely this Court would not consider itself powerless to interpose in such a case.

Our constant reiteration that an appellate court is without authority to review a sentence has no basis in law or logic. MCLA 769.1; MSA 28.1072 provides that Justices of the Supreme Court have sentencing power, as fully as circuit judges. There is no reason to suppose that such authority is idly given or has no relation to the appellate function.

The authority, indeed the duty, of this Court to vacate sentences which exceed the permissible limits of statutory provisions is clear. Such sentences are illegal. They violate the law. As such, they are null and void.

The Constitution is the fundamental law. It is as explicit and as binding on courts as the pronouncements of the legislature. A sentence of a court which violates the Constitution is illegal. This Court is not without the power to support and observe the Constitution and to apply it to the actions of judges, even when such actions are literally within the discretion vested by statute.

The legislature has no power to invest a court with discretion to violate the Constitution.

This case of *Sinclair* has been given much notoriety. Defendant and his supporters have used his conviction and sentence as a vehicle to attack the wisdom and efficacy of the marijuana laws.

We have declined to enter into that controversy. The judicial fact-finding process is not adaptable to finding mixed questions of fact and policy.

But we do note that the possession of narcotic drugs is a crime *malum prohibitum* only. This is particularly apparent in the case of marijuana. The statute prohibits possession of any part of the cannibus sativa plant. Possession of a natural growing plant can hardly be *malum in se.*

As officers sworn to uphold the Constitution we recognize with understanding, the action of the learned trial judge.

The attitude of hostility and remorselessness displayed by the defendant and the disruption of orderly proceedings by his supporters surely combined to tax the patience of the court. And certainly if rehabilitation were the sole purpose of sentencing, the measure of the imprisonment would be more the posture of the defendant than the gravity of the offense.

But rehabilitation is not the only function of punishment. It is not even always possible. Where the defendant is recalcitrant, whether from principle or out of sheer meanness, the law cannot, in a free society, disregard the nature of the offense and address itself only to the character of the offender.

Where a minimum sentence is imposed which is demonstrably and grossly excessive, in the light of the depravity of the criminal as shown in the commission of the act and in light of the usual and customary disposition of those convicted of like conduct, such minimum sentence violates the constitutional prohibition against the inflicting of cruel or unusual punishment, and is illegal and void.

The sentence is vacated, and the cause is remanded for re-sentencing. In the meantime defendant will be admitted to bail with bond in the amount of $1,000.

ADAMS, J., concurred with T. E. BRENNAN, J.

BLACK, J., did not sit in this case.