PEOPLE v ARNOLD

1. CRIMINAL LAW—NEW TRIAL—DISCRETION.

The granting of a motion for a new trial in a criminal case rests in the discretion of the trial court.

2. CRIMINAL LAW—PLEA OF GUILTY—VOLUNTARINESS—INDUCEMENTS.

A trial judge properly denied a motion to set aside a plea of guilty allegedly not voluntarily and understandingly made because of unfulfilled promises or misleading statements by a defense counsel where an evidentiary hearing was had and where the trial court found in substance that any statements made by defense counsel could not be fairly interpreted as a promise of leniency and a review of the record supports such a finding.

3. CRIMINAL LAW—PLEA OF GUILTY—UNDERSTANDING PLEA.

A contention that the trial court did not explain to the defendant in any detail the nature of the offense of second-degree murder, a charge to which defendant pleaded guilty, is without merit where the record shows that that count of the information was read to the defendant once before defendant pled and again before the plea was finally accepted, in the interim the court examined at length three other witnesses about the events which transpired on the day of the shooting, and the court assured itself that defendant and his counsel had thoroughly examined the possibility of going to trial with a defense of self-defense.

4. CRIMINAL LAW—PLEA OF GUILTY—EQUIVOCAL PLEA.

A defendant's admission of guilt of murder in the second degree was not an equivocal one and his plea was properly accepted where the admission of guilt was not the only basis for accepting his plea, in that other witnesses had testified to the shooting and to defendant's menacing the deceased with a revolver,

REFERENCES FOR POINTS IN HEADNOTES

[1] 58 Am Jur 2d, New Trial § 165.

[2–4] 21 Am Jur 2d, Criminal Law § 484 *et seq.*

[5] 21 Am Jur 2d, Criminal Law §§ 525–530; 40 Am Jur 2d, Homicide §§ 549–557.

the revolver was carried by the defendant approximately 80 miles to the scene of the shooting with an expressed intent of using it in the event of trouble, and the defendant had shot the deceased three times; once the trial court had satisfied itself that there was a factual basis for the defendant's plea, and that it was freely, understandingly, and voluntarily made, the court was free to exercise its discretion on whether or not to accept the plea (MCLA 750.317, 768.35; GCR 1963, 785.3[2]).

5. CRIMINAL LAW—SENTENCE—SECOND-DEGREE MURDER.

A sentence within the statutory limits will not ordinarily be disturbed on appeal; a sentence of 10 to 30 years for second-degree murder was not excessive (MCLA 750.317).

Appeal from Mecosta, Harold Van Domelen, J. Submitted Division 3 May 10, 1973, at Grand Rapids. (Docket No. 13827.) Decided June 26, 1973.

Aubrey Arnold was convicted, on his plea of guilty, of second-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Charles B. Woodruff,* Prosecuting Attorney (Prosecuting Attorneys Appellate Service, *Thomas R. Lewis,* Director [by *Howard C. Marderosian],* of counsel), for the people.

*Donley, Walz, Fershee & Jordan,* for defendant on appeal.

Before: DANHOF, P. J., and McGREGOR and MILES,* JJ.

DANHOF, P. J. Defendant was initially charged with murder in the first degree in the shooting death of one Alfred Barry. On October 18, 1971, defendant plead guilty to murder in the second degree, MCLA 750.317; MSA 28.549. On November

---

* Circuit judge, sitting on the Court of Appeals by assignment.

18, 1971, defendant was sentenced to a prison term of 10 to 30 years. Thereafter, on July 14, 1972, defendant filed in the trial court a motion to withdraw plea, to set aside conviction and sentence, and for a new trial. On August 7, 1972, a full evidentiary hearing was had and on August 31, 1972, the trial court entered an order denying defendant's motion. Defendant appeals claiming that it was error for the trial court to refuse to allow defendant to withdraw his plea on the ground that the plea was not voluntarily and understandingly made. Defendant also claims that the minimum sentence imposed was excessive under the circumstances of this case. Finding no error, we affirm.

At the arraignment, after defendant had plead guilty, but before acceptance of the plea by the court, defendant was questioned extensively about the series of events which culminated, on September 20, 1971, in the death of Barry. Defendant told about his purchase of a mobile-home parts and repair business located in Paris, Michigan, from Barry two months before the shooting and of arguments between the two since the purchase. On the day of the shooting, defendant sent some of his employees from his place of business in Traverse City to Paris, Michigan, to pick up merchandise involved in the purchase. Defendant stated that it was necessary for him to have the merchandise picked up that day because his lease on a building in which the equipment was stored was to expire at midnight. Upon arriving in Paris, defendant's employees noticed that Barry had padlocked the door of this building and they telephoned defendant. Defendant decided to leave Traverse City for Paris, a distance of approximately 80 miles, in the company of Robert Johnson. Defendant testified

that before he left, he telephoned the Mecosta County Sheriff's Department and the county prosecutor, notifying them of possible trouble, and that, because he received no cooperation from either office, he brought along a .32-caliber revolver and some shells. Upon arriving in Paris, defendant cut the padlock with a hacksaw and directed his employees to begin removing the purchased equipment and to load it on a truck. Barry arrived, and arguments and threats ensued. Defendant fired what he claimed to be a warning shot at Barry who was sitting on a chair inside the building. At this point, defendant claims that Barry feigned a heart attack and that defendant went to Barry's rescue. Defendant testified that Barry grabbed him and proceeded to beat him and that Barry had his fingers around defendant's throat. The two men wrestled to the ground and at this point defendant shot Barry.

The court then proceeded to examine three more witnesses before accepting defendant's plea. Robert Johnson, who accompanied defendant to Paris, testified to a statement made by defendant before leaving Traverse City:

"*Q.* Did he ever make a statement about Mr. Barry in that afternoon?

"*A.* Before he left the shop he said, 'If Al gives him any more shit, I'm going to blow his fucking brains out'."

In other respects, Johnson substantiated defendant's version of events.

William Dunham, another of defendant's employees, testified that there were a total of five of defendant's men in or around the building at the time of the argument and that Barry had none of his employees at the scene; that, before the first

shot was fired, defendant was menacing the seated Barry with a gun, and that the first shot missed Barry by about a foot. He further testified that after the feigned heart attack and during the struggle, defendant shot Barry three times.

State Police Trooper Wayne K. Johns testified that he responded to a call reporting a shooting and that he arrived at the scene after defendant was in the custody of another trooper. Barry's body was photographed and a search made for physical evidence. There were four spent cartridges in the six-shot .32-caliber revolver. One bullet was found lodged in the wooden portion of a door and the location of that bullet, approximately 52 inches from the floor, was consistent with a person being shot at slightly above and to the right of the head if this person were seated in a chair which was positioned in front of the door. Trooper Johns further testified that at the autopsy performed on Barry's body the next day, Dr. Charles Black removed two suspected .32-caliber bullets from the right axillary region and another such missile from the pelvic region. That these bullets were handed to Johns who placed them in marked vials.

After the above three witnesses had testified, the court questioned defendant's attorney, Robert Stephan, about the possibility of self-defense. Mr Stephan answered that self-defense had been fully discussed and that defendant nevertheless had decided to plead guilty to second-degree murder. The court then questioned defendant at length, after again reading to him the added count. Defendant was asked whether he understood the defense of self-defense and he answered that he did, but still wanted to enter a plea of guilty. Defendant was asked whether any promises had

been made and he answered in the negative. Defendant was told that the court itself would not know what sentence would be pronounced, if the plea were accepted, until after a full presentence investigation. Defendant stated that he understood. Whereupon, defendant's plea was accepted.

A motion was then made by defense counsel for release on bond pending sentencing. Defendant was asked by the court if the possibility of bond had influenced his plea in any way. Defendant answered that he had extensive business interests to wind up and would appreciate release on bond to clear up these matters, but that he had decided to plead guilty independent of that influence. The court warned defendant that the possibility of bond should not influence defendant in any way to enter a plea to such a serious charge. Defendant acknowledged this, but again reiterated that it was his decision to plead guilty to second-degree murder. Thereupon, the court granted defendant's motion for release on bond pending sentencing.

At the hearing on the motion to withdraw plea on August 7, 1972, defendant testified that one of his attorneys, Robert Kievit, told the defendant that a deal had been made with the prosecutor for a sentence of 3 to 10 years or 5 to 15 years in exchange for his plea, and that with credit for good behavior defendant would serve approximately 18 months jail time. Kievit, however, denied having any discussions with the prosecutor, Charles Woodruff, regarding possible sentences and further denied that any such representations had been made to the defendant. The prosecutor denied any agreements as to sentence and, in fact, said that it has never been his policy to even make sentence recommendations because he feels that sentencing is and should remain entirely within the discretion of the court.

Defendant's other attorney, Robert Stephan, testified that he had discussed with the prosecutor the sentencing inclinations of the trial judge and that the figure of 18 months had come up; that he did not consider this as any kind of a guarantee, but was merely Stephan's professional guess. He testified that he communicated the figure of 3 to 5 years minimum, with possibly as little as 18 months actual prison time, to the defendant, but that he made no guarantees or said anything which could have reasonably been so interpreted. He testified that he thought it best for defendant to plead guilty to second-degree murder, rather than risk a mandatory life sentence upon conviction of first-degree murder; that he was troubled by one piece of evidence, *i.e.,* that defendant had carried a weapon all the way from Traverse City, which could be viewed as some indication of premeditation. Stephan testified that his estimation was that the defendant would at the very least be convicted of manslaughter if he went to trial. All of these considerations were discussed with the defendant who in the end made the decision to plead guilty to murder in the second degree. Stephan stated that he represented the defendant at sentencing, and was surprised and even angry that the 10 to 30 year sentence was more severe than he expected because, as a professional, he did not enjoy making guesses that far off target. However, he stated that he was even angrier at the defendant for being seen at a bar prior to sentencing, and for being heard there making statements about his case. Stephan attributed the more severe sentence to the latter incident. At the conclusion of the hearing, the court found that defendant's plea had been freely, understandingly, and voluntarily made:

"This Court is unable to give credence to the defendant's claim when opposed by the record, the testimony of his attorneys, and the prosecutor to the effect that no statement, promises, or guarantee as to a minimum sentence was made to the defendant. The defendant is a mature person of fairly wide business experience and does not lack intelligence and is above average especially in regard to matters of every-day life. The defendant was fully aware of what he was doing and the consequences of his plea. His plea was voluntarily, completely understood without coercion, promise, or threat."

In explaining defendant's sentence, the court stated:

"The fact that the defendant went into a bar while out on bond made no difference to the Court in regard to the sentence imposed. The minimum sentence of 10 years was imposed by the Court because in the opinion of this Court the taking of a human life is a serious matter and not to be treated lightly."

Defendant's motion to withdraw plea was filed almost 8 months after sentencing, and approximately 5-1/2 months after appointment of appellate counsel. In *People v Byrd,* 12 Mich App 186; 162 NW2d 777 (1968), a denial of a motion to withdraw plea was held not to be an abuse of discretion where defendant's motion was made almost two months after sentencing. This Court therein stated, at pp 192–193 (162 NW2d 779–780), that the grant of a motion for a new trial rests in the discretion of the trial court and that the judicial process must not be allowed to be abused by a defendant who is simply dissatisfied with the sentence imposed.

Defendant however contends that his plea was not voluntarily and understandingly made because he was under the impression that an agreement had been made with the prosecutor regarding

minimum sentence. He refers us to *In re Valle,* 364 Mich 471, 477–478; 110 NW2d 673, 677 (1961):

"If the evidence establishes that the prosecutor or the judge has made a statement which fairly interpreted by the defendant (in our case of foreign extraction and with only an eighth-grade education, presumably in court for the first time) is a promise of leniency, and the assurance is unfulfilled, the plea may be withdrawn and the case proceed to trial."

We do not quarrel with the further proposition that unfulfilled promises or misleading statements by defense counsel can be the basis for setting aside a plea. Without confining *Valle* to its facts, it should be noted that in that case the statement of defense counsel was made in open court and, although subject to various interpretations, alluded to an agreement with the prosecutor. The statement went unrebutted by the prosecutor and unquestioned by the trial judge. *Valle,* as interpreted by *People v Johnson,* 386 Mich 305, 314; 192 NW2d 482, 486 (1971), teaches that the proper recourse in a case such as this is an evidentiary hearing to determine whether the plea was freely, understandingly, and voluntarily made. In the instant case, an evidentiary hearing was had, and the trial court found in substance that any statements made by defense counsel could not, in the words of *Valle,* be "fairly interpreted" as a promise of leniency. We find no error.

Defendant contends that the trial court did not explain to the defendant in any detail the nature of the offense of second-degree murder. The record however reveals that the second count of the information was read to the defendant once before defendant plead and again before the plea was finally accepted, and that in the interim the court examined at length three other witnesses about

the events which transpired on the day of the shooting. Moreover, the court assured itself that defendant and his counsel had thoroughly examined the possibility of going to trial with a defense of self-defense. We hold that defendant fully understood the nature of the offense to which he plead guilty.

Defendant contends that the trial court should not have accepted his plea because the circumstances surrounding the killing of Barry indicate at most the crime of manslaughter. Defendant further contends that his admission of guilt to murder in the second degree was equivocal. First of all, defendant's admission of guilt was not the only basis for accepting his plea. Other witnesses testified that prior to the shooting, defendant was menacing the deceased with a revolver, and that this revolver was carried by the defendant approximately 80 miles to the scene of the shooting with an expressed intent of using it in the event of trouble; further, that defendant shot Barry not once, but three times. We can have no way of knowing how a finder of fact might have interpreted this evidence, but we know that it was of considerable concern to defendant's counsel.

Secondly, defendant errs in his claim that the trial court was constitutionally required to reject his plea unaccompanied by an absolute and unequivocal admission of guilt. The case of *North Carolina v Alford,* 400 US 25; 91 S Ct 160; 27 L Ed 2d 162 (1970), is similar to the case at bar. Alford was indicted for first-degree murder, at that time a capital offense. His appointed counsel questioned witnesses that Alford said would substantiate his claim of innocence, but these witnesses instead gave statements that strongly indicated his guilt. Defense counsel recommended a plea of guilty, but

left the final decision to Alford who thereafter plead guilty to second-degree murder. Alford told the trial court that he had not committed the murder, but that he was pleading guilty because he faced the threat of a death penalty. When Alford persisted in his plea, it was accepted. Mr. Justice White, in writing for the majority, stated:

"Thus, while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." 400 US 37; 91 S Ct 167; 27 L Ed 2d 171.

Moreover, defendant in the case at bar did not, like Alford, deny the shooting, but rather tried to cast his actions in the light most favorable to his case. Parenthetically we note that defendant's equivocation in this regard followed an earlier affirmative answer on his part to the question of whether he was pleading guilty because he was guilty of murder in the second degree, and came at a point in the plea proceedings after the court had examined the other witnesses as to the factual basis of defendant's plea. We repeat that the trial court was not constitutionally burdened with the task of rejecting defendant's plea on the mere possibility that a jury might have found defendant guilty of manslaughter or even determined that the killing of Barry was justifiable. Once the trial court had satisfied itself that there was a factual basis for defendant's plea, and that it was freely, understandingly, and voluntarily made, the court was free to exercise its discretion on whether or

not to accept it. MCLA 768.35; MSA 28.1058; GCR 1963, 785.3(2).

Defendant's final contention is that his sentence was excessive in light of the circumstances surrounding commission of the offense, citing *People v Sinclair,* 387 Mich 91 (1972), and the separate opinion by Justice BRENNAN at pp 134–153 (194 NW2d 878, 896–906). An appellate court has the authority to review a sentence to determine if it is excessive even if it is within the statutory limits. However, a sentence within the statutory limits will not ordinarily be disturbed on appeal. *People v Hooper,* 36 Mich App 123, 125; 193 NW2d 203, 204 (1971). Moreover we must conclude, as did the trial court, that "the taking of a human life is a serious matter and not to be treated lightly". Defendant's sentence of 10 to 30 years for second-degree murder was not excessive.

Affirmed.

All concurred.